FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 1 8 2020

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

United States District Court

Eastern District of Arkansas

Little Rock Division

United States of America                    4:05-cr-00109-JHL-12

VS.

Terrance Osborne

Defendants Letter for Reconsideration on Denial Order Dates May 14th 2020

Defendant, Terrance Osborne asks that this court to reconsider denial order for compassionate release.
Defendant spoke with courts legal assistant Ms. Emily on May 6th 2020 about how long defendant had to
file a response to the government's response on defendants motion for compassionate release.
Defendant was advised through message left on defendant's fiancés voicemail by the court legal
assistant that the defendant had until May 21st, 2020 to respond to the government's response before
an order would be issued by the court.  In defendants reply, defendant has proof that he has filed an
administrative remedy a request for compassionate release to the warden and did not receive a
response from the warden within the 30 day time frame, which would make government's argument
moot on that issue.  Defendant is a prose litigate that is in Federal Prison and  ask that the courts take
that into consideration along with the fact that the court did not give the defendant time to respond to
the government's response like the defendant was advised by the courts legal assistant.  The defendant
has filed a response with supporting Affidavits from the courts review.  Please take this as a
reconsideration letter.  Finally, defendant was advised to write this letter explaining what has been
stated herein by the courts legal assistant Ms. Emily on May 15th, 2020

Respectfully,

*Terrance Osborn*

Terrance Osborne

May 15, 2020

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF ARKANSAS

# LITTLE ROCK DIVISION

### 4:05-cr-00109-JHL-12

### UNITED STATES OF AMERICA

### vs

### TERRANCE OSBORNE
### Defendant.

_____

## DEFENDANT'S REPY IN OPPOSITION TO UNITED STATES' RESPONSE

## TO MOTION FOR COMPASSIONATE RELEASE

_____

**COMES NOW**, the Defendant, Terrance Osborne, and **REQUESTS** this Honorable

Court to **CONSIDER** the below Reply in Opposition to United States' Response to Motion for

Compassionate Release.  On or about April 15, 2020, the Defendant filed the instant action and

sought compassionate release due to Covid-19 virus outbreak in federal prisons, the risk he faced

of contracting the disease, and the shortness of his remaining time incarcerated of just 10

months.

The United States' 22-page Response to Defendant's Motion for Compassion Release

(henceforth Response) states a variety of reasons why the request for compassionate release

should be denied.  **DKT # 790 at 1-2 of 22**.  First, the Response stated that the Court lacks

1

jurisdiction in light of the defendant's failure to exhaust his administrative remedies.  **Id. at 1 of 22**.  Next, the Response stated that a reduction in sentence is not warranted because the defendant is a danger to the community.  **Id. at 2 of 22**.  Then, the Response stated that the BOP has a fully engaged action plan to deal with pandemic.  **Response at 15 of 22**.  And lastly, the Response stated that defendant's motion "could" be treated as a request for release on home confinement under the CARES Act, and denied because the Court would not have jurisdiction to consider a request of that nature.  **Id**

The Defendant **_opposes_** each of the positions taken by the Response.  First, this Court does have jurisdiction to entertain the motion. Because the defendant did send a request for compassionate release letter to the warden dated April 9, 2020 and the warden received the letter on April 13, 2020. (see attached exhibit #9 and #10) as of May 14, 2020 the defendant has not received a response from the warden and the thirty-day waiting period has expired for a written response to the request. Pursuant to U.S. Code Title 18 Section 3582 (c) (1) (A) (i), a court may reduce a term of imprisonment where "extraordinary and compelling reasons warrant such a reduction."  Prior to the enactment of the First Step Act in December 2018, only the Bureau of Prisons could bring such compassionate release applications.  Now, defendants can bring these applications themselves.  Section 3582 (c )(1) (A )(i) provides that compassionate release applications by a defendant can be made upon the earlier of "the defendant ha[ving] fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after "30 days from the receipt of such a request by the warden of the defendant's facility."

Thus, in the last month, the issue at the forefront of many of these applications has been whether federal courts are required to wait 30 days before they can rule on them.  First, any

defendant who has valid grounds to seek compassionate release in the current COVID-19

pandemic should immediately apply to the warden of the facility where they are being held for

the BOP to move for compassionate release of the defendant.  The Defendant submitted requests

to his case manager coordinator Ms. Parks on April 4, 2020 concerning early home confinement

and she stated orally that she had not received any directive from the Director of the Bureau of

Prison to allow her to release him to early home confinement.  **See Exhibit I.**[1]

Second, the statute's obvious congressional purposes, and the fact that a waiver of the

exhaustion requirement is consistent with those purposes.  "Generally, Congress imposes

exhaustion requirements in order to serve the twin purposes of protecting administrative agency

authority and promoting judicial efficiency."  Haney, 2020 U.S. Dist. LEXIS 63971, *8, (quoting

McCarthy v. Madigan, 503 U.S. 140, 145 (1992)

But strict enforcement of the 30-day waiting period in the current circumstances actually

impedes judicial efficiency, because it forces courts to consider the matter twice: first during the

30-day waiting period to determine whether the court may waive the exhaustion requirement,

and second a few days or weeks later to adjudicate the application on the merits once the waiting

period is up (or once the BOP has failed to respond to a court's direct request to weigh in).

A quick review of the docket of the U.S. District Court for the Southern District of New

York already reveals many instances where federal judges have considered the same release

application twice within days.  See, e.g. United States v. Russo, Dkt. 16-cr-441, 2020 U.S. Dist.

LEXIS 65390 (S.D.N.Y. Apr. 14, 2020) (Liman, J.) (ruling on application deferred on April 3,

2020 for failure to exhaust administrative remedies; same application considered on the merits

and denied without prejudice on April 14, 2020); United States v. Paciullo, Dkt. 15-cr-834, 2020

U.S. Dist. LEXIS 65198 (Apr. 14, 2020) (Wood, J.) (ruling on application deferred on April 14,

---

[1] Exhibit I was submitted in the initial filing by the Defendant.

2020 for failure to exhaust administrative remedies; court to consider merits on April 23, 2020).

This judicial inefficiency results from the fact that although a delay of a few days or a couple of

weeks may be meaningless in normal circumstances, it is not in the midst of a pandemic.  What

would be most efficient — and potentially save lives — would be for courts to waive the 30-day

waiting period the first time they consider the application.  In the words of U.S. District Judge

Jed Rakoff:

> Congressional intent not only permits judicial waiver of the 30-day exhaustion period,
> but also, in the current extreme circumstances, actually favors such waiver, allowing
> courts to deal with the emergency before it is potentially too late.

Haney, 2020 U.S. Dist. LEXIS 63971, *11-12.  Although Congress usually aims at protecting an

administrative agency's authority when imposing an exhaustion requirement, the compassionate

release statute is clearly different from any traditional exhaustion requirement in that respect.

For one, it is apparent that the statute greatly reduces the importance of the administrative

agency's authority because it provides that a defendant can seek judicial determination before the

agency has rendered a final decision.  The language of the statute and the history of its enactment

in the First Step Act (which for the first time permitted defendants to seek relief directly from a

court instead of having to rely exclusively on the BOP) show that Congress intended to assure

meaningful and prompt judicial determination for defendants seeking compassionate release.

See, e.g. Id. at *9.

In the words of U.S. District Judge Lewis Liman:

Section 3582 (c) is a distinctive federal statute, unlike those in the cases cited by the
Government.  It does not reflect unqualified commitment to administrative exhaustion
and it does reflect acknowledgement that the judiciary has an independent interest in, and
responsibility for, the criminal judgments it is charged with imposing.  It has features of
an administrative exhaustion requirement and of a timeliness statute.  As previously
explained by the Court, the plain language of Section 3582 (c) evinces congressional
intent that a defendant has a right to a prompt and meaningful judicial determination of
whether she should be compassionately released, regardless of whether administrative

remedies have been exhausted.  (Dkt. No. 54 at 4.)  There is no other way to read the language giving a defendant the right to make a judicial motion for compassionate release thirty days after making an application to the BOP, without needing to wait for the administrative process to be completed.

Russo, 2020 U.S. Dist. LEXIS 65390, *15-16.  In essence, the 30-day rule was meant as an

accelerant to judicial review.  The Court is charged with interpreting congressional intent and it

would pervert congressional intent to treat it as a substantial obstacle to effective judicial review.

Id. at *17

Third, it should be emphasized that because Section 3582 (c) (1) (A) was only recently

enacted and is "extremely unusual (if not unprecedented)," id. at *16, reliance on cases that have

considered traditional exhaustion requirement statutes is ineffective and risks frustrating the

purposes of the statute.  The uniqueness of Section 3582 (c) (1) (A) stems from the fact that it

"does not contain an exhaustion requirement in the traditional sense.  That is, the statute does not

necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the

BOP) before bringing his petition to court."  Haney, 2020 U.S. Dist. LEXIS 63971, *8.  With

Section 3582 (c) (1) (A), Congress plainly did not intend for the BOP to have a full opportunity

to consider a defendant's application or to correct its own errors because Congress provided that

a defendant was entitled to meaningful review by a judge after 30 days, even if the BOP has not

considered the application by that point.  And, as discussed below, there is a consensus that

Section 3582 (c) (1) (A) is not a jurisdictional requirement.

The U.S. attorney's office has waived the administrative exhaustion requirement in recent

cases, and in those cases the court decided that it was thus permitted to grant the application even

if it had been pending for less than 30 days.  See, e.g., Nash, No. 15-cr-445, ECF No. 1084, 3

("To its credit, the Office has elected, in some cases prompted by the COVID-19 emergency, not

to invoke that doctrine [of administrative exhaustion as a barrier to judicial action], permitting

the Court to order the release of inmate whose compassionate release application had been pending for less than 30 days."); <u>Gentille</u>, 2020 U.S. Dist. LEXIS 62680, *9 ("The Court agrees with the Government that § 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional, but rather is a claims-processing rule that the Government can waive by failing to raise an exhaustion argument."). See also <u>Hamer v. Neighborhood Hous. Servs. of Chicago</u>, 138 S. Ct. 13, 17 (2017) (holding that mandatory claim-processing rules "may be waived or forfeited"). More recently, courts have held that "the First Step Act did not empower the Government with the sole authority to decide when and under what conditions exhaustion may be waived," <u>United States v. Smith</u>, No. 12-cr-133, 2020 U.S. Dist. LEXIS 64371, *10 (S.D.N.Y. Apr. 13, 2020) (Keenan, J.),  and that if the office can waive the exhaustion requirement, so can a federal court. Id. See also <u>Russo</u>, 2020 U.S. Dist. LEXIS 65390, *11-13.

Then the Response stated that the Defendant is a danger to the community and should not be released early. **Response at 13-14 of 22**. The Response added that the Defendant's condition and the current pandemic do not justify compassionate release of the Defendant. **Id. at 14 of 22**. The Defendant *opposes* this response too!

The Defendant's family engaged Jack Donson, former BOP case manager, as an expert to provide the court context as to BOP policy (See Exhibit #12 affidavit).  The Defendant attaches Mr. Donson's affidavit and CV to address issues as to whether Defendant poses a danger to society.  In addition, Mr. Donson provides insight into the living conditions at the prison camp along with the challenges the BOP faces in creating social distancing, the most effective means of preventing the spread of Covid-19.

Defendant *opposes* the positions taken by the Response; because in less than 12 months he will be released to supervised release without home confinement if he is still alive.  The

Defendant is currently incarcerated at a satellite prison camp, a minimum-security out custody prison (see exhibit #4 on motion to reduce sentence docket #783). He has been approved for halfway house placement on November 9, 2020 and has a home confinement date of November 6, 2020. The Defendant's full-term release date is May 6, 2021.

Inmates, situated as the Defendant, earned the right to be incarcerated in satellite camps based on their lack of danger to the community, their ability to operate independent without supervision, their lack of violence behavior, the lack of prison infractions, and the belief that they can be trusted not to leave the camp with no enclosures. If the Defendant had been considered a danger to the community, he would not have been placed in a minimum security out custody satellite prison camp. The government is inconsistent on whether the defendant is a danger to the community. Proof can be shown by reviewing the docket sheet #777 defendants Unopposed Motion To Reduce Sentence on 4-23-2015. The defendant received a reduced sentence from the court on a 3582 (c ) (2 ) Motion in which the government did not "oppose" the defendant receiving 48 months off his original 240 months sentence. Since that reduction, the defendant has taken several programs, classes, and has reduced his custody classification to the lowest custody level that the bureau of prisons has to offer. (see exhibit #3 page 1 docket #783). Furthermore, the defendant has no violence in his background and the defendant has proof of where the bureau of prisons gave the defendant an 8 hour and 30-minute furlough with his cousin on 9-4-2019. The defendant successfully made it to the designated facility without incident and passed an urinalyses test upon arrival (see exhibit #13 pages 1-5).

Barr told federal prosecutors in a memorandum on April 3rd to take the pandemic into account when deciding whether to seek pretrial detention. While the attorney general stressed that public safety should still be prosecutors' highest priority, he said they should consider the

outbreak as a factor, especially in cases where the defendant presents little risk of flight or harm to the community or in cases where the defendant is particularly susceptible to COVID-19. Shon Hopwood, an associate professor of law at Georgetown University Law Center, said he's been encouraged by the recent number of judges that are willing to grant release in a variety of cases, even those involving people who have committed violent offenses but have a good record of rehabilitation and who are particularly vulnerable to the threat posed by COVID-19.

Next, the Response stated that "in an effort to mitigate the spread of the virus in its detention facilities, BOP has instituted a five-phased COVID-19 Action Plan to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating persons sentenced or detained based on judicial orders.  **Response at 15 of 22**.  The Defendant *opposes.*

By all accounts, the BOP has been overwhelmed with compassionate release applications due to the COVID-19 pandemic and has been unable to deal with them in a timely fashion.  See, e.g. Haney, 2020 U.S. Dist. LEXIS 63971, *10-11 ("Because of the pandemic, prisoners have inundated the BOP with requests for release.  Frustrated with the agency's inability to adjudicate their petitions quickly, these prisoners are coming to courts en masse irrespective of the 30-day rule.").  Meanwhile, federal courts — which have generally seen their usual dockets reduced in light of the current COVID-19 pandemic — are dealing with increasing numbers of compassionate release applications, with judges issuing detailed reasons in record time.

In the current COVID-19 pandemic, already the BOP is telling federal courts that it simply cannot deal with the volume of compassionate release applications.  For example, on April 6, the BOP wrote in response to a request from the court regarding a compassionate release application that it was "unable to commit to resolving [defendant]'s application by April 10, 2020, on account of the multi-stage internal review process at the BOP and competing demands

on the BOP's time," and failed to commit to a date by which it would be able to decide the application. United States v. Nash, Dkt. 15-cr-445, ECF No. 1084 (Apr. 8, 2020) (Engelmayer, J.). Several courts have held that such circumstances are sufficient to trigger the exception contemplated in Theodoropoulos. Skelos, 2020 U.S. Dist. LEXIS 64639, *8.

Prisoners, often those with medical conditions that leave them particularly vulnerable to grave health consequences if they contract the virus, have been flooding courts with motions for compassionate release as the number of confirmed cases of infection inside Federal Bureau of Prisons facilities rises by the day. As of May 11, 2020, there are 3379 federal inmates and 250 staff who have confirmed positive test results for COVID-19 nationwide, according to the Federal Bureau of Prisons. There have also been 49 inmate deaths attributed to COVID-19, federal officials say.

However, advocates believe the actual rate of infection is far higher, pointing to a lack of widespread testing, and 70% of the federal inmates who have been tested nationwide have tested positive for the COVID-19 as of May 11, 2020. According to the Arkansas Governor Asa Hutchinson speech May 11, 2020. There are 332 federal inmates and 16 staff members at the Forrest City Arkansas Federal Prison Complex have tested positive for the COVID-19 where the defendant is being held as of May 11, 2020.

While U.S. Attorney General William Barr has directed the BOP to increase the use of the agency's own authority to release inmates to home confinement in response to COVID-19, more and more inmates are not waiting on what can be a lengthy bureaucratic process, opting to take their cases to court and move for compassionate release.

Jonathan M. Smith, executive director of the Washington Lawyers' Committee for Civil Rights and Urban Affairs who is working on a pro bono effort through the Compassionate

Release Clearinghouse to provide legal counsel to the most vulnerable inmates, said there have been some very good decisions recently in inmates' favor, but rulings have been far from uniform.  "It's uneven around the country.  Some judges have been much more sympathetic than others," Smith said. "There's so much happening right now, it's kind of hard to catalog it all."

In New York, at the heart of the pandemic, there is a growing split among judges as to how to handle the question of whether the exhaustion requirement can be waived.  For example, U.S. District Judge Alison J. Nathan held Monday that she lacked the authority to waive the requirement and release a New Jersey pastor convicted for his role in an unlawful bitcoin exchange scheme, though she made clear she would release him when the statutory 30-day requirement was met.

In another case, U.S. District Judge Jed S. Rakoff held that the requirement is waivable, but nevertheless declined to order the release of convicted money launderer Hugh Brian Haney after finding no "extraordinary and compelling" reason to do so.  Two inmates had better luck before U.S. District Judge Analisa Torres, who on April 3 ordered that 75-year-old financier Morris Zukerman — who had about a year left in his sentence for tax evasion — serve out the rest of his term on home confinement in light of his health conditions, including diabetes and hypertension, which place him at a high risk of complications and death if he were to be infected with COVID-19.  Judge Torres held that the exhaustion requirement can be waived in light of the "extraordinary threat" posed to Zukerman by the pandemic.

Wilson Perez, who was convicted of kidnapping and conspiracy, also was granted a compassionate release by Judge Torres due to his medical issues.  Inmates in pretrial detention or awaiting sentencing appear to have had somewhat greater success in getting released due to coronavirus concerns.  Another area of some success for the defense bar is getting judges to

postpone self-surrender dates in light of the crisis.  Adams said he's found courts to be receptive
to coronavirus-related bail arguments, especially in white collar and nonviolent cases, and even
in cases where a judge might otherwise order detention.  "I've experienced a willingness of the
courts to not only move up prescheduled bail reviews because of the crisis, but to release
detainees pending some other further action like trial, in the interest of public safety," he said.

Next, the Defendant *opposes* the Response statement that defendant's motion "could" be
treated as a request for release on home confinement under the CARES Act, and denied because
the Court would not have jurisdiction to consider a request of that nature.  **Response at 15 of 22**.
Going forward, experts say to expect more COVID-19 litigation aimed at getting at-risk inmates
released, above and beyond compassionate release bids.  Last week, the American Civil Liberties
Union brought a class action on behalf of inmates at Oakdale Federal Detention Centers in
Oakdale, Louisiana, that seeks the release of people who are particularly at risk due to age or
underlying medical conditions.  In another case filed in late March, a proposed class of medically
vulnerable inmates in Brooklyn's Metropolitan Detention Center sued for their release, claiming
the prison has violated their Eighth Amendment protection against cruel and unusual punishment
by failing to enact basic COVID-19 safeguards.

Rachel Barkow, a professor of law and faculty director at New York University School of
Law's Center on the Administration of Criminal Law, told Law360 that these cases are likely
just the beginning.  "I think the next round of things they're going to be facing are these
constitutional challenges to what's happening inside these facilities," Barkow said.  "Because
they're really not providing sufficient medical care and healthy conditions for the people who
reside there."

Oregon's federal public defender said Wednesday she fears an inmate's suicide and other reports she's received of inmates harming themselves stem in part from the continued coronavirus lockdown at the federal prison in Sheridan.  Though Lisa Hay said she didn't know exactly why the inmates chose to hurt themselves, she said the prisoners face unprecedented strain from having to stay in their cells with no visits from family or friends or their attorneys.

"The psychological and physical stress of the 14-day lockdown is becoming overwhelming for some of the inmates and detainees at Sheridan according to reports we are receiving,'' said Hay, who runs the federal government's Public Defender's Office in Oregon. The Federal Bureau of Prisons this week extended the lockdown through May 18.  Sheridan's population has fallen by 17 inmates from 1,804 to 1,787 since Attorney General William Barr on April 3 ordered the Federal Bureau of Prisons to review "all at-risk'' inmates for consideration for early release, according to Hay.  She said that's not enough and has called on the warden of the sole federal prison in Oregon to alert the U.S. District Court that inmates over 65, who face a higher risk of contracting the coronavirus, are eligible for compassionate release.

A judge would then decide case by case -- without having to wait 30 days for the warden's decision on a defendant's eligibility as is required under federal law.  One of the compassionate release motions that Hay has filed for an inmate was rejected by a judge, who found the inmate hadn't exhausted that 30-day administrative step through the warden of the Sheridan prison.

"Instead of going through that long administrative review process, which they don't have the staff to accomplish right now, they should send those directly to the courts,'' Hay

12

said.  Inmates are locked in their cells now, she said, and have "almost no ability to request compassionate release" from the warden themselves.  "This is a crisis," Hay said. "We need many hands helping before the coronavirus infects those at Sheridan."

Federal prosecutors in Oregon have argued in cases that have already made it to court that the 30-day requirement for a warden to respond to an inmate's petition for compassionate release is important to obtain and review an inmate's medical records and give victims a chance to weigh in.  No inmate or staff at the prison in Sheridan is known to have tested positive.  Nationwide, 451 federal inmates and 280 federal prison staff have confirmed COVID-19 cases and 16 inmates have died from the disease, according to the Federal Bureau of Prisons.  Hay said she was disturbed by a suicide at the prison early Monday.  She also has received reports from other inmates at Sheridan of two inmates who severely cut themselves – one who slashed himself in the neck, she said.   It's not known if the lockdown played any role in Brian Cluff's decision to kill himself. He was found unresponsive in his cell and an autopsy found that he died by hanging. The FBI is investigating.

The 47-year-old Idaho man had been in custody at Sheridan since last December serving a sentence of 26 years and 10 months for conspiracy to deliver methamphetamine and gun possession.  Suicide rates increased from 8.1 per 100,000 federal inmates in fiscal 2016 to 14.7 per 100,000 inmates in fiscal 2018, with 66 inmates who died from suicide during that time, according to the bureau. Information on number of suicides at the prison in Sheridan wasn't immediately available.

No one at the prison or from the Bureau of Prisons responded to requests for information about steps being taken to prevent inmates from hurting themselves.  Sue Allison, a spokeswoman for the prison's bureau, said three inmates have died by suicide in federal-operated facilities since Jan. 1.  The Bureau is providing "enhanced screening" of inmates

placed in quarantine or isolation due to confirmed COVID-19 or high-risk exposure, with a psychologist required to see an inmate within 24 hours of their placement in such conditions. "Inmate suicide prevention remains a high priority and anytime inmates report or are suspected of being at elevated risk of suicide, a suicide risk assessment is completed consistent with the Bureau suicide prevention policy," Allison said. "A portion of the Bureau inmates are classified as needing frequent, routine treatment. Psychologists continue to monitor these inmates closely and ensure they are being seen on a regular basis.

On its website, the agency says it "recognizes that incarceration can be stressful for both inmates and their family members" and that the agency works to educate its staff and inmates on suicide prevention.

According to the bureau, when an inmate arrives at a prison, they're given information about mental health services available. "The BOP's suicide rate is lower than that of the United States population as a whole, however, one life lost is one too many,'' its website says. On Wednesday, the Office of the Inspector General also announced it will be starting "remote inspections'' at various Bureau of Prisons facilities, to ensure the agency is complying with the government's guidance and best practices to prevent and contain a coronavirus outbreak behind bars. The goal is to assist the Bureau of Prisons in "mitigating the health risks arising from the pandemic," according to the Inspector General's office.

If the CARES Act will provide relief to the Defendant, it should be used. But, if not the Defendant requests this Court to review the instant action on the merits under Section 3582 (c) (1) (A) (i) in which it was filed.

Lastly, the defendant opposes the government's response pertaining to page 14 section A. The defendants condition the current pandemic do not justify compassionate release of the defendant.

14

The government did recognize that the defendant has severe asthma and takes medication daily. The defendant can in no way stay socially distance from other inmates in the dormitory style setting at the prison that the defendant is held at. The defendant can stay socially distance and quarantined at the approved residence by the federal probation and parole (see affidavit by Mary Wells Aunt exhibit #11 attached). By the court granting the defendants motion it will in fact save the defendant's life. Please take into consideration that the defendant has served over 92% of his sentence. The defendant has a supporting affidavit from a BOP expert and former BOP employee stating facts pertaining to the defendant (see Exhibit #12).

## CONCLUSION

The Defendant's pre-existing medical conditions, asthma and seizure disorder, present the risk of contracting the Covid-19 virus and dying a violent death almost a certainty if something is not done to eliminate the threat. Covid-19 is a highly infectious disease caused by the SARS-CoV-2 virus, and, according to the BOP's own statistics, there are 246 inmate positive infections (May 13, 2020). There is little ability for inmates to social distance within the facility and there is no testing of asymptomatic inmates or staff. As the disease primarily affects the respiratory system, people with moderate to severe asthma who develop COVID-19 may be at higher risk of developing severe symptoms. The Defendant uses an inhaler daily to help with his breathing, and, he is presently taking medication to control the seizure disorder.

Asthma is a chronic lung condition that affects the airways and causes inflammation. This inflammation causes spasms and narrowing of the airways, which leads to wheezing, breathlessness, and coughing. Generally, when a person contracts a respiratory virus, the infection sets the body's immune response in motion. In people with asthma, this can lead to an overproduction of substances that only worsen inflammation. COVID-19 is slightly different. It

causes an inflammatory process inside lung tissue rather than the usual bronchial inflammation that occurs in asthma.  Respiratory viral infections, such as COVID-19, can trigger and worsen asthma symptoms. According to the Centers for Disease Control and Prevention (CDC), it can also lead to pneumonia in people with moderate to severe asthma.

The Defendant stands by his instant filing and incorporates that petition with this Reply in its entirety.  The relief the Defendant has requested should be granted for the reasons stated above.

Dated: May 15, 2020

Terrance Osborne # 23729-009
FCI Forrest City -Camp
P. O. Box 9000
Forrest City, AR 72336

## CERTIFICATE OF SERVICE

**************************

I certify that on 15 day of May , 2020, I served a copy of this Defendant's Reply in in Opposition to United States' Response to Motion for Compassionate Release with one exhibit on the Clerk, U.S. District Court, 500 West Capitol Avenue, Little Rock, AR 72201; and on the Office of the United States Attorney, P.O. Box 1229, Little Rock, AR 72203, ATTN: Edward O. Ward, AUSA, by placing same in the U.S. Mail, postage prepaid.

Terrance Osborne, pro se

Terrance Osborn #23729-009
FCI Forrest City Low
Federal Correctional Institution
Satellite Camp
Post Office Box 8000
Forrest City, Arkansas 72336


Thursday, April 9, 2020


Attn: Warden DeWayne Hendrix
FCI Forrest City Low
Federal Correctional Institution
1400 Dale Bumpers Road
Forrest City, Arkansas 72335

Ref: Compassionate Release for Terrance Osborn #23729-009

Attention Warden DeWayne Hendrix:

I, inmate Terrance Osborn #23729-009, am requesting for Compassion Release due to the COVID 19 virus. I am a first-time non violent offender. I have served over 90% of my time. I was sentenced to 240 months in prison in November 2007 by Judge Leon Homes, in the Eastern District of Arkansas for Possession of Powder Cocaine and Conspiracy to Possess with Intent to Distribute Powder Cocaine. In 2015, my a Motion for a Sentence Reduction under 18 U.S.C. § 3582 (c)(2) and my sentence was reduced to 195 months imprisonment due to the all drugs minus the two point reduction for first-time non-violent offenders passed by President Obama.

My release date is May 6th 2021. My RCC placement date is November 9th 2020 and my Home Confinement eligibility date is November 6th 2020.

I am currently housed in the Federal Camp here at Forrest City Arkansas Minimum Security and I am an Out Custody Inmate. I have a Total Security Level Points of 7 and was furloughed here from my last location at the Oklahoma City Cadre Unit by Wardens Fox. I successfully made it from Oklahoma City, Oklahoma to Forrest City, Arkansas in the time frame allowed with my family on September 4th 2019.

Statement of Facts: I have several health issues that make me vulnerable to the COVID 19 virus. I have severe asthma problem and I am a chronic care level inmate do to my asthma problem and my seizure disorder. I am prescribed an asthmatic inhaler and a weasel and I receive medication on a daily basis for my asthma problem and my seizure disorder. You can see my medical records will reveal that I received both medications for the entire time of me being in Federal Prison.

I am very vulnerable to the COVID 19 if I come in contact with it and I am trying to take precautionary measures.

During my time incarcerated, I have taken several programs and I have matured a lot within the last 7 years of incarceration. I have a home release plan and my residence has been approved by Federal Probation and Parole as of February 2020. My unit team recommended me for 9 to 12 months halfway house and I only received 5 months and 27 days halfway house. I am requesting that you give me Compassion Release and free me from prison so I can be socially distant and not be contracted with the COVID 19.

Thank you for your time and immediate attention in this matter.


Sincerely, *Terrance Osborn*

TERRANCE OSBORN

Exhibit #10

**U.S. Department of Justice**
Federal Bureau of Prisons
*Federal Correctional Institution*

P.O. Box 7000
Forrest City, AR 72336-7000

Official Business

4-13-20

THE ENCLOSED LETTER WAS PROCESSED THROUGH SPECIAL MAILING
PROCEDURES FOR FORWARDING TO YOU. THE LETTER HAS BEEN NEITHER
OPENED NOR INSPECTED. IF THE WRITER RAISES A QUESTION OR PROBLEM OVER
WHICH THIS FACILITY HAS JURISDICTION, YOU MAY WISH TO RETURN THE MATERIAL FOR
FURTHER INFORMATION OR CLARIFICATION. IF THE WRITER ENCLOSES CORRESPONDENCE
FOR FORWARDING TO ANOTHER ADDRESSEE, PLEASE RETURN THE ENCLOSURE TO THE
ABOVE ADDRESS.

To: WARDEN Mr. DeWAYNE HENDRIX

From: TERRANCE OSBORN #23729-009

# Affidavit

State of Arkansas, County of Independence

My current legal name is Mary Wells, and my current occupation is disabled.  I am presently 62 years old, and my current address of residence is 830 Elm Street, Batesville, Arkansas 72501.

Mary Wells, Aunt to Terrance Osborne writes this affidavit on my own will in support of Terrance Osborne's motion for compassionate release.  I agree to be a third-party custodian if the court deems necessary for my nephew Terrance Osborne.  My residence 830 Elm Street Batesville, Arkansas 72501 has been approved by Federal Probation and Parole form the Eastern District of Arkansas by probation officer Mr. Jordan Riggs.  I have never been convicted or charged with a crime.  I am a law-abiding citizen and I have never been in any trouble whatsoever.  I am a 62 years old and I draw a monthly disability check.  I have owned my own home for over 30 years.  I reside in the residence by myself. I have no guns or anything that the probation officer stated that is prohibited for me to have in the residence while Terrance is living with me.  Terrance's mother AKA my sister and his father has passed away since Terrance has been incarcerated.  Terrance's mother Tammy Osborne left behind an insurance policy check in early 2016 that Terrance received from MetLife Insurance Company in the amount of $31,000 that Terrance has received and has access to when he is released from Federal Prison.  I believe that Terrance has matured a lot since he was arrested at the age of 24 he is now 39 years old and sees things a lot differently.  Terrance has family that loves him and will help him in any way including but not limited to myself, my children and his brother.  Terrance has never been in a gang or any organization and to this day Terrance does not have any tattoos or piercings.  I think that is great considering that Terrance has been in Federal Prison for approximately 14 straight consecutive years.  I give my word to this court is Terrance is released I will report any suspicious wrongdoings to the proper authorities.  I can guarantee Terrance will be supervised by me daily and he will stay socially distant while he resides at my residence.  Feel free to call me at my residence 870-698-0598 or my cell phone 870-613-3646 if you have any further questions or need any other document signed

Thank You

I hereby state that the information above is true to the best of my knowledge.  I also confirm that the information here is both accurate and complete and relevant information has not been omitted

_Mary Wells_

Signature of Individual

_5 - 14 - 2020_

Dates

Exhibit #12

US DISTRICT COURT-EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>TERRANCE OSBORNE )<br>Defendant. ) | Docket No.  4:05-cr-00109-JHL-12<br><br>**AFFIDAVIT OF<br>JACK DONSON** |

I, Jack Donson, hereby declare under penalty of perjury that the following is true and correct:

I have been asked to review the Government's Opposition to Mr. Osborne's Motion for Compassionate Release and provide feedback to the court on matters within my expertise relative to Federal Bureau of Prison's policy and process in support of the overall motion.

## STATEMENT OF EXPERTISE

1.  I am the Founder of My Federal Prison Consultant which I started after retiring from the Federal Bureau of Prisons (BOP). I am also co-founder of Prisonology LLC which provides Continuing Legal Education (CLE), advisory services and expert testimony on federal prison issues. I have worked with federal offenders for over thirty one years and have testified in District Courts throughout the country and in the United Kingdom based on my experiences and knowledge of the BOP. In the last two years, I have been asked to review the records of numerous Incarceration Reduction Amendment Act (IRAA) cases as an expert witness.

2.  I have been employed within the field of criminal justice for more than thirty three years, with twenty three years employed by the BOP working in classification, correctional programs and treatment.  I am active in following policy initiatives and routinely attend conferences, including the annual U.S. Sentencing Commission Conference which provides training by BOP staff on federal prison issues and processes. I also chair a sub-committee on BOP policy for the ABA Corrections Committee, contribute to legal newsletters and actively serve on the National Association of Criminal Defense Lawyers' (NACDL) Corrections Committee. I have been published in The Hill as an Opinion

Contributor and have been a guest commentator for various national television networks including Fox News and CNN.

3. During a majority of my career, I managed a case load of approximately 150 individuals as a Correctional Treatment Specialist. In that capacity, I was responsible for inmate counseling, security classification, program placement/evaluation and re-entry. This involved managing inmates with different types of sentences imposed under both "old law" and "new law" as well as DC Superior Court offenders. I also had full time and collateral administrative responsibilities in training case management staff, mentoring, policy writing, conducting facility audits and overseeing institutional programs. I have worked in Minimum (camp), Low, Medium, Administrative (pre-trial and high security), and Witness Security units. On several occasions I was temporarily assigned to the BOP Philadelphia Regional Office and the New York City Community Corrections Office. I have expertise with the U.S. Parole process and BOP sentence computations. Prior to working at the BOP, I was employed in the Commonwealth of Pennsylvania as a Probation/Parole Officer.

4. Unlike high level retired BOP administrators, my skill set is unique, policy focused and has been molded by reality and direct involvement interacting with inmates in the trenches in the Federal prison system on a daily basis throughout my career, which continues today by Corrlinks correspondence, visiting facilities around the U.S. and my pro-bono capacity for FedCURE as their National Director for Inmate Programs and Services. In this capacity, I interact regularly with BOP central office staff regarding various prison issues.

5. I hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I was a Lecturer at Marywood University for several years and taught three different Criminal Justice courses including one entitled The American Prison. A true and correct copy of my *curriculum vitae* is attached. I have personal knowledge of the facts stated herein and can testify competently thereto if called as a witness in this matter.

6. I was retained by the family of Terrance Osborne (Inmate No: 23729-009) who is currently in BOP custody at FCI Forrest City satellite prison camp, a minimum security facility. I reviewed documentation provided to me by the family, including PATTERN score, disciplinary records, education records and the pre-sentence report. I also reviewed Mr. Osborne's motion to the Court for Compassionate Release.

## COVID-19 IN PRISON

7. The BOP tracks active COVID-19 cases in all of its institutions across the country and, in my capacity as an advisor to law firms and defendants, monitor the BOP's website. As of today (May 13, 2020), the BOP has 247 confirmed positive COVID-19 test results on inmates and 1 among the staff. According to the BOP, 50 inmates have recovered from the virus as have 2 staff members. The BOP has expanded inmate testing at its institutions and expects, as a result, to show increasing number of infections.

8. Prison facilities like the minimum security camp, make social distancing, one of the primary means of reducing contagion of COVID-19. Inmates in camps like Forrest City, live in an open dorm environment where common facilities like showers and toilets are shared by a large number of people. Further, phones and email terminals are few, usually no more than 3-4 phones and the same number of computer terminals shared by over 100 inmates. While the BOP has taken steps to reduce contagion, such as providing masks and encouraging the washing of hands, it is a fact that the BOP is limited in its ability to implement a social distancing protocol.

9. The BOP is currently operating under modified operations at all of its facilities, suspending social visits (in effect since March 13, 2020), curtailing legal visits, reducing the transportation of inmates between facilities, screening staff/inmates for symptoms of COVID-19 and restricting contractor entry to those deemed "necessary" for institutional operations. It is expected that these measures will stay in place for the foreseeable future.

10. Under the CARES Act and under advisement from Attorney General William Barr, the BOP has started to increase the use of Home Confinement to allow some inmates to complete their sentences at a home residence. In other cases, inmates have sought release from prison and the effects of COVID-19 under provisions of Compassionate Release. In the remaining part of this affidavit I am providing clarification to statements made by the government in its Response to Defendant's Motion for Compassionate Release (Docket No. 790, dated April 4, 2020).

## Exhaustion

11. In my professional opinion and experience, it is clear Mr. Osborne has met the exhaustion requirement based on his request of April 9, 2020. From a policy perspective, Program Statement 5050.50 *"Compassionate Release/Reduction In Sentence: Procedures 18 USC 3582 & 4205(g)"*, dated January 17, 2019, page 3, paragraph 1b (Summary of Changes) states, *"Specifying inmates may file directly to court after exhaustion of administrative remedies, or 30 days from receipt of a request by the Warden's Office."*

12. Since the COVID crisis has disrupted the operations of the BOP, district courts have been sensitive to the crisis and have granted relief without the 30-day exhaustion. I was personally involved in such a case (U.S. v Jason Haynes, Western District of New York, Case No: 6:18-CR-06015 EAW). In that case, U.S. District Court Judge Elizabeth A. Wolford ordered the release of Mr. Haynes and noted that " the administrative exhaustion requirement has been waived by the Government; and further finds that Defendant is not a danger to the safety of any other person or to the community …" Mr. Haynes was released on April 14, 2020.

## Danger to the Community

13. Next I want to address the government's position that Mr. Osborne is a risk to the community. From a correctional treatment and policy perspective, Mr. Osborne is currently assigned to a minimum security institution, the lowest security institution in the BOP where there are four distinct categories of security; High, Medium, Low and

Minimum).  Camps usually have no fence or a patrolled physical barrier.  In addition to being assigned to a minimum security camp, Mr. Osborne has been assigned a custody level, "Out" Custody, that would allow him to go on unsupervised furloughs or have work assignments that could put him in contact with the population of citizens.  If the BOP believed Mr. Osborne to be a threat to society, it has the ability, through Program Statement 5100.08, Inmate Security Designation and Custody Classification, Chapter 5, page 5, to to assign what is referred to as a Greater Security Management variable to prohibit camp placement if the agency perceived Mr. Osborne as a threat to the community.  As demonstrated by Mr. Osborne's placement at the Forrest City Camp and custody level, the BOP does not deem him as a threat.

14. Like every inmate in the BOP, Mr. Osborne is assigned to a Unit Team who conducts regularly scheduled program reviews and period security classification assessments to determine risk. The Unit Team who has day to day interaction with him are in the best position to determine community risk, particularly for an inmate who has been in BOP custody since 2007.

## PATTERN Risk Assessment

15. Subsequent to the passage of the First Step Act in December 2018, the BOP recently began using the Risk Assessment Tool referred to as "PATTERN". All BOP case managers received training in the use of this assessment tool and every BOP inmate has been classified according to four levels of recidivism risk: "<u>Minimum</u>," "<u>Low</u>," "<u>Medium</u>," and "<u>High</u>." While the government indicated Mr. Osborne's PATTERN score is "Low" and not "Minimum". It should be noted that inmates have two PATTERN risk scores.  There is a risk for violence and a risk for recidivism. Mr. Osborne does indeed have a minimum PATTERN score for the risk of violence and the only thing elevating his general recidivism to low is his age. Mr. Osborne is 39 and he will lose 7 points upon his 41st birthday at which time he will be a minimum risk.  It is my professional opinion, Mr. Osborne has been overlooked simply due to his PATTERN score.  He is currently scheduled for transfer to a halfway house in November 2020, just six (6) months from now.

## BOP Compliance with COVID Protocols

16. While the government points to the BOP's aggressive action to prevent the spread of COVID-19 throughout their facilities, the agency has been the subject of numerous class action lawsuits regarding its level of care and protection afforded inmates in its care.  In the Northern District of Ohio (Craig Wilson et al v Mark Williams et al, Case No 4:20-cv-00794) U.S. District Judge James S. Gwin issued an Order on April 22, 2020 related to the care of inmates at FCI Elkton, a BOP operated facility, that "*While Respondents offer certain prison-practice changes to show they know COVID-19 risks and have sought to reduce those risks, the Court still finds that, at this preliminary stage of the litigation, the Petitioners have sufficiently met the threshold for showing that Respondents have been deliberately indifferent. One only need look at Elkton's testing debacle for one example of this deliberate indifference. Additionally, Elkton has altogether failed to separate its inmates at least six feet apart, despite clear CDC guidance for some time that such*

*measures are necessary to stop the spread and save lives."*

17. While I appreciate that the BOP has taken a number of measures to protect both inmates and staff, it was discomforting for me to discover that the BOP has a specific plan that was meant to proactively address pandemic's like COVID-19. The BOP's *"Pandemic Influenza Plan Module 1: Surveillance and Infection Control,"* dated October 2012 has a clear plan to initiate aggressive action to address contagion of viruses. The plan has 6 stages. According to stages 2-5 *"begins when it is announced that there are confirmed human outbreaks overseas, involves both making last-minute preparations and actually responding to pandemic flu."* Stage 4 is instituted when there is "First human case in North America." According for the Center for Disease Control and Prevention press release, the first human-to-human contact in North America occurred on January 30, 2020. The BOP did not stop social visits at institutions until March 13, 2020, 6 weeks after the institutions should have been in a more responsive state.[1]

## CONCLUSION

18. It is clear Mr. Osborne has satisfied his exhaustion for Compassionate Release consideration from a BOP policy perspective. It is my professional opinion having worked with and classified thousands of inmates during my career that Mr. Osborne is not a threat to the community based on the BOP's own risk assessment tools, his placement in a minimum camp environment as well as a halfway house placement in November 2020.

19. While the decision to release Mr. Osborne on the basis of Compassionate Release is a matter for the court, I want to also provide another possible remedy to this situation in the event such a release is not granted.  One consideration not raised by Mr. Osborne nor cited in the government's response to Mr. Osborne's initial motion for Compassionate Release, is the possibility of the Court making a non-binding recommendation to the Federal Bureau of Prisons that he receive re-consideration for Home Detention under the CARES Act given that the only criteria he does not meet is the minimum risk for general recidivism due to his age. Mr. Osborn already has a residential re-entry center placement date for November 2020, so a practical resolution to his situation and personal safety from the potential for COVID-19 may be for the BOP to reassess his overall CARES Act eligibility and honor the Courts' recommendation in accordance with their agency's discretion. It should be noted that as a BOP policy and practice, the agency attempts to accommodate judicial recommendations but more specifically, even their own written guidance on the CARES Act does not automatically preclude the home confinement approval on inmates with a low risk of general recidivism. I ask that the Court also consider this information when making a decision on Compassionate Release.

Executed on this 15th day of May, 2020.

Jack T. Donson
Co-Founder Prisonology

---

[1] CDC website: https://www.cdc.gov/media/releases/2020/p0130-coronavirus-spread.html

Prisonology                                                                                                5

# Prisonology™

**Curriculum Vitae**

Jack Thomas Donson
Email:jack@Prisonology.com
Telephon: 617-858-5008

**Employment History**

September 2014-Current: **Prisonology** (VP- Operations & CLE Development) www.Prisonology.site

April 2013-Current: **Executive Director of Out4Good, LTD ,** 44 Wall Street, 13th Floor, New York, NY  10005 (212) 461 -2335 www.out4good.org

June 2011-Current:  **President of My Federal Prison Consultant, LLC**, 44 Wall Street, 12th Floor, New York, NY 10005 (212) 461-2252 www.mfpcllc.com

July 2011-Current:  **Director of Program and Case Management Services**, Fed CURE, Plantation, Florida (Prison & legislation reform advocacy-nonprofit) www.fedcure.org

January 2013-Current, **Lecturer-Marywood University,** Scranton, PA- Criminal Justice Professor-Currently teaching courses entitled "Community Corrections and Shadow and Service".

April 2015-current: Board of Directors-**Choosing Integrity,** Greentown, PA www.choosingintegrity.org

**1988-2011**: Federal Bureau of Prisons, **Correctional Treatment Specialist- Retired**
- Case Management related positions responsible for the counseling, classification and preparation of inmates for re-entry. I coordinated several institution programs and trained staff in Correctional Programs related areas.
- Special expertise with high profile Organized crime figures, the  Witness Protection (WITSEC) program & White Collar Crime offenders
- Alternate Case Management Coordinator 1991 to 2011
- Assignments in the Regional Office, Philadelphia, PA. (CIM Coordinator/Correctional programs), New York City Community Corrections Office (processing designations and halfway house referrals) & several National (DC) policy writing work groups

1

- Testified on Capitol Hill to the Colson Task Force on Federal Corrections
- Appointment to the **NACDL Corrections Committee 2011**
- Appointment to the **ABA Corrections Committee 2012**
- Authored articles published in the "News & Views" (AO) and "The Debt Beat"
- Member of the Prison Reform, Sentencing Reform & Re-entry Work Groups (PRWG)
- Associate member of the ABA & NACDL
- Member of the PA Prison Society
- Board member-Choosing Integrity (501 C3)
- Overall offender advocacy & general Federal prison & legislative reform efforts
- Guest presenter for the Course entitled "Engaging Incarcerated Parents", PA Child Welfare Training Program, University of Pittsburgh

**In-Court Testimony and Training**

- November 2019 - Iowa Public Defender Training
- February 3, 2018 - District of New Jersey CJA Annual Training
- November 8, 2017 - Training at Federal Defenders Office San Diego, CA
- November 7, 2017 - Training Federal Judges San Francisco, CJA Training San Francisco
- June 14, 2017 - Training Session for U.S. Probation Office and U.S. District Court Judges, District of CT
- May 18, 2017 - Thrills and Skills Training for Office of Public Defender Eastern Washington and Idaho
- March 16, 2017 - Training Session on BOP Issues Regarding Sentencing in Bridgeport Federal Courthouse (District of Connecticut at invitation of U.S. District Judge Stefan Underhill and Judge Victor Bolden)
- March 13, 2017 - Southern District of New York, U.S. District Judge Jed Rakoff (Reference Case: 16-cr-246003 (JSR))
- February 27, 2017 - District of New Jersey, U.S. District Judge Peter G. Sheridan (Reference Case: 3:16-cr-00430-PGS)
- February 8, 2017 - District of New Jersey CJA Annual Training
- November 15, 2016, Eastern District of Washington, U.S. District Judge Edward F. Shea (Reference Case: 2:11-cr-00195-EFS)
- May 11, 2016, District of Maryland,  U.S. District Judge Ellen L. Hollander (Reference Case: 1:13-cr-00151-ELH-34)
- January 29, 2016 - Eastern District of Tennessee, U.S. District Judge Harry Mattice (Reference Case: 1:15-cr-18 )
- January 29, 2016 - Eastern District of Tennessee, U.S. District Judge Harry Mattice (Reference Case:  4:14-cr-29)

**Federal Bureau of Prisons**
**Health Services Division**

# Pandemic Influenza Plan

# Module 1:
# Surveillance and Infection Control

**October 2012**

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## BOP Pandemic Influenza Response Stages

The BOP *Pandemic Influenza Plan* is divided into the three stages that are used for standard BOP contingency plans; in this plan, the three stages are designed to correlate with the Federal Government Response Stages for pandemic influenza.

**The BOP Pandemic Influenza Response Stages are as follows:**

- PREPARATION (Federal Response Stages 0–1). Most of the detail in this plan involves the preparation phase.

- RESPONSE (Federal Response Stages 2–5). This phase, which begins when it is announced that there are confirmed human outbreaks overseas, involves both making last-minute preparations and actually responding to pandemic flu.

- RECOVERY (Federal Response Stage 6). This phase involves recovering from the pandemic, evaluating actions taken during the pandemic, and preparing for more flu. Based on what we know from previous pandemics, subsequent waves of flu are likely to follow once the pandemic flu has subsided.

| Federal Government Response Stages* | | BOP Influenza Plan | |
|---|---|---|---|
| | | **Federal Stages** | **BOP Stage** |
| **0** | New domestic animal outbreak in at-risk country | 0-1 | PREPARATION |
| **1** | Suspected human outbreak overseas | | |
| **2** | Confirmed human outbreak overseas | 2-5 | RESPONSE |
| **3** | Widespread human outbreaks in multiple locations overseas | | |
| **4** | First human case in North America | | |
| **5** | Spread throughout United States | | |
| **6** | Recovery & preparation for subsequent waves | **6** | **RECOVERY** |

*The Federal Government Response Stages should not be confused with the World Health Organization phases of pandemic influenza.*

i

# Overview

Starting now, every BOP institution should creatively and aggressively promote three health habits that interrupt flu transmission: regular hand hygiene, respiratory etiquette (coughing or sneezing into a sleeve or tissue); and avoiding touching one's mouth, nose or eyes).

This guidance provides general information about pandemic influenza. In the event of a pandemic, specific guidance related to that event will be issued by the Medical Director.

During the 1918–19 pandemic influenza ("flu"), certain cities fared better than others. Those U.S. cities that both acted promptly to control the flu *and* implemented multiple layers of protective measures had fewer flu cases and lower overall mortality. The procedures for surveillance and infection control outlined in this plan include multiple layers of protection. With the onset of pandemic flu, the BOP Medical Director will guide implementation of infection control measures based on the severity of the flu outbreak. The key to protection of both employees and inmates is swift, decisive, coordinated action based upon advance planning.

## How is flu transmitted?

When people who are sick with the flu either cough or sneeze, they release infectious droplets that can enter another person's body through their eyes, nose, or mouth. Flu germs can spread through the air, up to six feet away from the sick person. Flu virus particles do not remain suspended in the air. However, if a person who is sick with the flu touches surfaces, such as telephones and door knobs, the surface can become contaminated with the flu virus. Other people then can become infected with the virus by touching the surface and then touching their eyes, nose, or mouth.

## When can a person transmit flu?

For the purposes of this guidance, the *infectious period* for influenza is generally defined as: one day before fever starts until 24 hours after fever ends. Some people may shed virus for a while longer; however, studies have shown that after fever resolves there is a significant reduction in the ability to transmit infection.

## How long does it take for symptoms develop?

The estimated *incubation period* (the time between acquiring influenza and becoming ill) is generally 1–4 days (average: 2 days).

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

# Table of Contents

OVERVIEW ............................................................................................................. 1

    Surveillance ....................................................................................................... 2

    Infection Control ............................................................................................... 2

        1. Promote good health habits among employees and inmates. ...................... 3
        2. Conduct frequent environmental cleaning of "high-touch" surfaces. .......... 3
        3. Separate the sick from the well. .................................................................. 3
        4. Create "social distance" between people. ................................................... 6
        5. Use personal protective equipment for close contact with flu cases. ........... 6
        6. If widespread flu transmission, consider targeted distribution of face masks. .............. 7
        7. Provide ongoing infection control education. ............................................. 7

    Influenza Outbreak Scenarios and Control Measures ....................................... 8

ACTION STEPS BY PANDEMIC STAGE ................................................................. 9

STANDARD OPERATING PROCEDURES FOR PREPARATION STAGE ........................... 12

ATTACHMENTS

    Attachment 1.1. BOP Pandemic Influenza Outbreak Scenarios
           and Control Measures ............................................................. 18

    Attachment 1.2. Use of BEMR to Track Influenza-Like Illness (ILI) ................ 19

    Attachment 1.3. Influenza-Like-Illness (ILI) Screening Form ........................ 20

    Attachment 1.4. Correctional Standard Precautions – General Population .......... 21

    Attachment 1.5. Correctional Standard Precautions – Health Care Settings ........ 22

    Attachment 1.6. Influenza Infection Control – General Population .................. 23

    Attachment 1.7. Pandemic Influenza Precautions – Health Care Settings .......... 24

    Attachment 1.8. Pandemic Flu Contact Investigation/Quarantine Procedures ...... 26

    Attachment 1.9. Pandemic Flu Contact Investigation/Quarantine Line List ........ 27

    Attachment 1.9. (Instructions) ..................................................................... 28

    Attachment 1.10. Precaution Signs for Influenza Isolation and Quarantine Units ........ 29

TABLES

    Table 1. Pandemic Flu Infection Control Measures ...................................... 2

    Table 2. Definitions of "Isolation" and "Quarantine" ................................. 3

    Table 3. Updated Definitions of "Face Masks" and "Respirators" (CDC-2009) ........ 6

# Surveillance

Surveillance refers to the process of detecting and tracking diseases. Surveillance for flu involves screening for influenza symptoms (to rapidly identify flu patients and isolate them); and collecting, analyzing, and reporting data on individuals who are diagnosed with influenza-like illness. The BOP utilizes the following definition of influenza-like illness:

> ***Influenza-like illness (ILI):*** *Fever (temperature of 100° F [37.8° C]) plus either cough or sore throat—in the absence of a known cause other than influenza.*

During a pandemic of influenza, ILI will be tracked utilizing BEMR. On a daily basis, enter into BEMR the occurrence of: ILI, complicated ILI (requiring prescription medication or intravenous fluids), ILI related hospitalization, and ILI related deaths. This will allow local facilities and the central and regional offices to closely track the occurrence of ILI within BOP. See *Attachment 1.2* for specific BEMR codes and definitions.

# Infection Control

Infection control consists of practices that interrupt the spread of disease. A variety of measures to interrupt flu transmission are listed in *Table 1* below and discussed on the following pages.

| Table 1. Pandemic Flu Infection Control Measures |
|---|
| 1. Promote good health habits among employees and inmates:<br>  **a.** Regular hand hygiene<br>  **b.** Respiratory etiquette (coughing or sneezing into a sleeve or tissue)<br>  **c.** Avoiding touching one's eyes, nose, or mouth |
| 2. Conduct frequent environmental cleaning of "high touch" surfaces. |
| 3. Separate the sick from the well.<br>  **a.** Advise employees to stay home from work if they are sick.<br>  **b.** Promptly identify and contain inmates with influenza-like illness (ILI).<br>  **c.** Isolate or cohort inmates who are sick with pandemic influenza.<br>  **d.** Conduct contact investigations for flu cases and quarantine contacts. |
| 4. Create "social distance" between people. |
| 5. Use personal protective equipment (PPE) for close contact with flu cases. |
| 6. If widespread flu transmission, consider targeted distribution of face masks (only with permission of BOP Medical Director or designee). |
| 7. Provide ongoing infection control education. |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

---

### 1. Promote good health habits among employees and inmates.

Critical to preventing flu transmission is a triad of good health habits, including:

  a. *Regular hand hygiene*
  b. *Respiratory etiquette (coughing or sneezing into a sleeve or tissue)*
  c. *Avoiding touching one's eyes, nose, or mouth*

Preparing for pandemic flu involves improving compliance with these basic infection control measures, *beginning now*. Each facility should assure that adequate supplies and facilities are available for hand washing for both inmates and employees.

Health care workers should have access to alcohol-based hand rub provided in accordance with fire and safety rules. CDC has made no recommendations regarding the use of non-alcohol based hand rub, but use of these products is presumably better than no hand hygiene at all. Provision of non-alcohol based hand rub via dispensers should be considered in key areas that lack facilities for hand washing, i.e., outside the dining hall, in the visitor area, etc.

Provisions should be made for employees and visitors to wash their hands before and after they enter the facility. The triad of good health habits should be promoted in various ways, i.e., educational programs, posters, campaigns, assessing adherence with hand hygiene, etc. Relevant educational tools are available on Sallyport on the Health Services Division page.

---

### 2. Conduct frequent environmental cleaning of "high-touch" surfaces.

Another general infection control measure is to routinely clean surfaces that are frequently touched and therefore can become contaminated with germs. These can include door knobs, keys, hand rails, telephones, computer keyboards, elevator buttons, inmate cell bars, etc. Increasing the frequency of environmental cleaning of these surfaces is something that also can be started now, thereby preventing transmission of infections such as the common cold, seasonal flu and MRSA. Some facilities have increased environmental cleaning of high-touch surfaces by increasing the number of inmate workers assigned to this duty.

---

### 3. Separate the sick from the well.

Transmission of pandemic flu can be prevented by separating those who are ill from those who have not been infected. In the event of pandemic flu, several measures should be implemented to separate the sick from the well. Below in *Table 2* are definitions of two important terms related to separating the sick from the well and that are frequently confused with each other.

---

| Table 2. Definitions of "Isolation" and "Quarantine" |
| --- |
| *Isolation:* Confining individuals who are **sick with influenza** (ILI cases) either to single rooms or by cohorting them with other influenza patients. |
| *Quarantine:* Confining asymptomatic persons who are **contacts of influenza cases**, while they are in the incubation period (until 4 days after exposure ended). |

**The following measures are recommended to separate the sick from the well.**

---

**a. Advise employees to stay home from work if they are sick.**

---

The most likely way that pandemic flu will gain entrance to a facility is via infected employees. In the event of pandemic flu, staff should be educated to stay home if they have influenza symptoms. If employees become sick at work, they should be advised to promptly report this to their supervisor and go home. In general, the timetable for returning to work is 24 hours after a person's temperature returns to normal.

---

**b. Promptly identify and contain inmates with influenza-like illness (ILI).**

---

Prompt identification and isolation of inmates with ILI is critical. During the course of pandemic influenza, *all* inmates should be screened at intake, based upon guidance from the Medical Director. If ILI is circulating within the institution, inmates should be screened at triage/sick-call and prior to transfer or daily transport. In addition, all staff should be advised to report if any inmates are symptomatic.

Immediately place a face mask on all individuals who are identified as having ILI symptoms (if it can be tolerated). They should be isolated or cohorted with other sick inmates (see below).

***Screening at intake:*** The screening of inmates upon arrival should be adapted to the particular situation at each facility, with the goal of keeping new arrivals segregated from other inmates, until the screening process has been completed. Screening should be conducted utilizing the revised *Influenza-Like Illness Screening Form (Attachment 1.3)*.

***Screening at triage/sick-call:*** If ILI is circulating within the institution, inmates at sick-call should be asked about ILI symptoms; if symptoms are present, these inmates should be asked to wear a face mask and be physically separated from inmates presenting to sick-call for other reasons.

***Screening of transfers and daily transports:*** If ILI is circulating within the facility, inmates should be screened for ILI prior to transport. If ILI is identified in an inmate, in general, their transfer or transport should be postponed until the inmate has been fever-free for 24 hours (without fever-reducing medication).

---

**c. Isolate or cohort inmates who are sick with pandemic influenza.**

---

A critical infection control measure for pandemic influenza is to promptly separate inmates who are sick with flu symptoms away from other inmates in the general population. Inmates can be *isolated* in private rooms. Alternatively, groups of sick inmates can be *cohorted* together in a separate unit.

Rooms where inmates with ILI are either housed alone or cohorted should be designated "Influenza Isolation Units" (see *Attachment 1.7*). In general, no special air handling is

needed. Depending on how ill the inmates are, bunk beds may or may not be suitable. Ideally, the unit should have a bathroom attached. If not, inmates will have to wear a face mask to go to the bathroom outside the room. The door to the Influenza Isolation Unit should remain closed. A sign should be placed on the door of the room indicating that it is an Influenza Isolation Unit and listing recommended personal protective equipment (PPE) (see *Attachment 1.10*).

Within Influenza Isolation Units, Standard Precautions should be followed. The type or respiratory protection required (i.e., face mask vs. respirator) will be based on guidance from the Medical Director during the pandemic. Healthcare personnel caring for patients should wear gloves for all interactions that may involve contact with the patient or potentially contaminated areas in the patient's environment.

If the inmate with ILI must be taken out of isolation, a face mask should be placed on the sick inmate to reduce the risk of spray through cough or sneeze.

If the inmate with ILI must undergo a procedure that is likely to generate aerosols (e.g., suctioning, administering nebulized medications), then an airborne infection isolation (AII) room with negative pressure and 6 to 12 air changes per hour, is indicated. A respirator, eye protection (goggles or face shield), and a gown should be worn during patient care activities that are likely to generate splashes and sprays of blood, body fluids, secretions, or excretions, e.g., suctioning or nebulizer treatments.

In large dorm settings or camps, isolation may not be a possibility. If isolation is not feasible, attempt to place the beds of sick inmates at a distance of at least 6 feet from other inmates. It is recognized that if there is widespread flu transmission within a facility, isolation as a strategy may not be feasible.

See *Attachment 1.7* for more information about infection control procedures for Influenza Isolation Units. Personal protective equipment in isolation units is discussed on the next page.

---

### d. Conduct contact investigations for flu cases and quarantine contacts.

It may be appropriate to identify close contacts to pandemic flu cases and quarantine them in a separate unit. The purpose of quarantine is to assure that inmates who are known to have been exposed to the flu virus are kept separate from other inmates to assess whether they develop flu symptoms. For the purposes of this document, exposure is defined as having been in a setting where there was a high likelihood of contact with respiratory droplets and/or body fluids of a person with ILI. Examples of close contact include sharing eating or drinking utensils, or any other contact between persons likely to result in exposure to respiratory droplets. Close contact typically does not include activities such as walking by an infected person or sitting across from a symptomatic patient in a waiting room or office.

Within the BOP, the duration of quarantine during pandemic influenza is 4 days. As feasible, the beds/cots of quarantined inmates should be placed at least 3-6 feet apart. Quarantined inmates should be restricted from being transferred, having visits, or mixing with the general

population.  See *Attachments 1.8* and *1.9* for procedures and forms related to contact investigation and quarantine.  A face mask is recommended for staff who are in direct, close contact (within 6 feet) of quarantined inmates.

> ***Note:*** *Once multiple flu cases occur within multiple housing units, a decision may be made to abandon contact investigation and the subsequent quarantine of contacts.  In this case, everyone in the facility has become a "contact," and contact investigation and quarantine are no longer useful or appropriate control strategies.*

---

### 4.  Create "social distance" between people.

In the general community, an important method for preventing pandemic flu transmission will be to increase the distance between people by instituting various "social distancing" measures, e.g., closing schools, theaters, and churches; staggering work schedules; discouraging use of public transportation, etc.  While "social distancing" is more difficult to accomplish in a correctional setting, there are possible interventions.

Social distancing measures in BOP facilities could include:  limiting gatherings (group meals, religious services, work, classes, recreation, common areas); ending visitation; halting entrance to volunteers and contractors; discouraging shaking of hands, etc.   Individual units can be taken separately to recreation and the dining hall with thorough environmental cleaning in between. Each local pandemic flu planning committee should identify ways to accomplish social distancing within their facility.

With the occurrence of multiple cases of flu, lock-down—of individual dormitories, buildings, and entire institutions—should be considered on a case-by-case basis, in consultation with the Regional Medical Director.

---

### 5.  Use personal protective equipment for close contact with flu cases.

Anyone who is working in close contact with pandemic flu cases should be provided personal protective equipment.

a.  **Respiratory Protection:**  Face masks (not respirators) are recommended for use with *seasonal* flu patients because the primary mode of flu transmission is droplet spread (not airborne).  Respirators are generally utilized to protect against small airborne particles, e.g., with tuberculosis patients.

| **Table 3.  Updated Definitions of "Face Masks" and "Respirators" (CDC-2009)** |
| --- |
| ***Face Masks:***  Disposable FDA-approved masks, which come in various shapes and types (e.g., flat with nose bridge and ties, duck billed, flat and pleated, pre-molded with elastic bands).  They include the following categories of masks:  surgical, dental, medical procedure, and laser. |
| ***Respirators:***  N-95 or higher filtering, face-piece respirators that are certified by CDC/NIOSH. |

In the event of a pandemic flu, the use of respirators may be indicated, based on guidance from the CDC and the BOP Medical Director. Respirators should be worn in situations in which the virus may be aerosolized, including aerosol-generating procedures (such as endotracheal intubation, nebulizer treatments), resuscitation of a patient, or when providing direct care to a patient with confirmed or suspected influenza-related pneumonia.

**b. Gloves:** Healthcare personnel caring for patients should wear gloves for all interactions that may involve contact with the patient or potentially contaminated areas in the patient's environment. If gloves are worn, perform hand hygiene before donning and after removing gloves.

**c. Eye protection and gowns** should be worn by health care personnel when spray or splash or body fluids, secretions, or excretions is anticipated, e.g., suctioning, administering nebulized medication. Eye glasses are *not* sufficient for eye protection. Appropriately fitted, indirectly-vented goggles with a manufacturer's anti-fog coating provide the most reliable, practical eye protection from respiratory droplets, and they come in styles that can be fitted over eye glasses. Face shields can be used as an infection control alternative to goggles.

**d. Face masks** are the recommended personal protective equipment when in close contact (within 6 feet) of quarantined inmates (housing of asymptomatic contacts who have been exposed to ILI). Face masks do not require fit-testing. Face masks also should be placed on persons with ILI to prevent droplet spread, i.e., during transport.

---

## 6. If widespread flu transmission, consider targeted distribution of face masks.

It is unknown whether the targeted distribution and use of face masks during a pandemic flu outbreak will interrupt the spread of flu. Because of the close contact between people in BOP facilities, face masks have been stockpiled for distribution to employees and inmates in the event of pandemic influenza. Permission must be obtained from the BOP medical director prior to targeted distribution of face masks.

---

## 7. Provide ongoing infection control education.

Successful response to pandemic flu will depend greatly on strong education efforts prior to and during an actual event. The education for pandemic flu infection control is closely related to other important infection control education for BOP facilities. Education about hand hygiene, respiratory etiquette, and environmental cleaning provides benefits to inmates and employees with regard to a variety of infectious diseases. Infection control education should be ongoing— the more the better. Using a variety of media (posters, newsletters, video) increases the likelihood that employees and inmates will comply with infection control recommendations. The Central Office Health Services Division provides educational tools on Sallyport and will offer periodic Centra programs related to pandemic flu.

## Influenza Outbreak Scenarios and Control Measures

Three influenza outbreak scenarios and associated infection control measures have been developed, based on the number of ILI cases occurring and their distribution within a facility (see *Attachment 1.1*).

**The three scenarios include:**

- *Isolation Scenario* – single cases of ILI with minimal to no transmission

- *Quarantine Scenario* – ILI confined to single housing unit(s) or building

- *Widespread Transmission Scenario* – ILI occurring throughout the institution

For each scenario, general recommendations are made about the appropriate infection control measures to implement.  The control measures listed for each scenario are provided for general reference only.  Consult the Regional Office for guidance on management of specific outbreak situations.

## Action Steps by Pandemic Stage

> **Preparation** (Federal Response Stages 0–1)
> (See *Standard Operating Procedures*, which are provided for the Preparation stage only.)

1. Identify a staff person to be responsible for influenza surveillance and infection control.
2. Increase emphasis on good health habits to stop flu transmission, especially hand washing, respiratory etiquette, and avoiding touching the eyes, nose, and mouth.
   a. Make soap dispensers or hand soap available in all employee and inmate restrooms.
   b. Institute a plan to assure that soap dispensers are refilled regularly .
   c. Assure that inmates have an adequate supply of bar soap.
   d. Provide education to employees and inmates on hand hygiene, respiratory etiquette, and avoiding touching the eyes, nose, and mouth.
   e. Maximize access to alcohol-based hand rub dispensers in the Medical Unit (only if authorized by the warden).
   f. Regularly assess the hand hygiene practices of employees and inmates, and design measures to improve hand hygiene.
   g. Assure that employees and visitors can wash their hands when entering and leaving the facility.
3. Emphasize frequent cleaning and disinfection of high-touch areas, i.e., door knobs, keys, telephones.
4. Identify resources for influenza surveillance and control.
   a. Track international, national, regional, and local influenza trends.
   b. Identify public health department contacts for influenza (including 24/7 contact information).
   c. Communicate with your local health department and discuss collaboration on pandemic influenza preparedness.
   d. Identify any local or state reporting requirements for influenza/pandemic influenza.
   e. Identify laboratories capable of processing influenza cultures and cultures for novel (pandemic) influenza.
5. Begin tracking influenza trends by conducting surveillance for *seasonal* flu.
6. Establish procedures for influenza screening to be utilized with pandemic flu.
7. Identify administrative measures to accomplish "social distancing."
8. Identify areas within the facility that can be used for isolation and quarantine.
9. Develop plans for stockpiling and distributing infection-control supplies.
10. Provide routine training about flu transmission and prevention and control measures.
11. Conduct mock exercises related to surveillance and infection control in pandemic flu.

*(continued on next page)*

---

> **Response** (Federal Response Stages 2-5)

*Begin when there are confirmed human outbreaks of pandemic flu anywhere in the world:*

1. Reinforce education regarding influenza infection control.  Emphasize the triad of good health habits:  hand hygiene, respiratory etiquette, and not touching the eyes, nose, and mouth.

2. Consider placement of dispensers of non-alcohol hand rub in key areas that lack facilities for hand washing, i.e., outside the dining hall, in the visitor area, etc.

3. Increase environmental cleaning of "high-touch" surfaces, e.g., door knobs, keys, telephones.

4. Educate employees and visitors not to come to the facility if they have flu symptoms.

5. Assess adequacy of infection-control supplies (including face masks, respirators, and gloves) and review distribution plan.

6. If indicated by the Medical Director, provide respirator fit-testing, medical evaluation, and training to any employees who may be assigned to have contact with inmates with flu—in Influenza Isolation Units or for transport.

7. Initiate screening for influenza-like illness at intake and in triage/sick-call according to those outlined in the Standard Operating Procedures (see *Attachment 1.3*).

8. Conduct active surveillance to look for influenza cases (i.e., review temperature logs, triage/sick call, hospitalizations, staff absences, unexplained deaths, etc.).

9. On a daily basis, enter into BEMR:  cases of ILI, complicated ILI, ILI-related hospitalizations, and ILI-related deaths.  Produce regular reports on the status of ILI within the institution for institution leadership.

10. Review possible measures to increase "social distancing."

11. Review/revise the list of designated influenza isolation and quarantine units, and develop options for expanding bed-space as needed.

12. Advise health care workers to report any unprotected close contact with persons with ILI (either at work or at home).

*Begin after a suspected pandemic influenza case is diagnosed in the facility:*

13. Immediately isolate (or cohort) inmates with influenza-like illness in "Influenza Isolation Units", using the influenza precautions outlined in *Attachment 1.7*.

    a. Reinforce education of staff on infection control procedures to follow when caring for flu patients.

    b. Assure that adequate infection-control supplies and personal protective equipment, i.e., face masks, respirators, and gloves, are available.

    c. Place precaution signs (*Appendix 1.10)* on the doors of Influenza Isolation Units.

14. If there is flu transmission in the facility, begin screening all transfers and daily transports for ILI (see *Attachment 1.3*).

**15.** Perform triage at sick-call to rapidly identify inmates with flu symptoms and implement procedures for separating the sick from the well.

**16.** Conduct contact investigations of the initial flu cases that have been identified, and quarantine contacts according to procedures outlined in *Attachment 1.8*.  Place quarantine precaution sign (*Attachment 1.10*) on the doors and assure an adequate supply of face masks. Implement daily temperature and signs and symptoms check.  Immediately isolate any inmates that develop ILI symptoms.

> *Note: If there are multiple pandemic flu cases in multiple housing units, implementing contact investigations and quarantine may be inappropriate and abandoned as a strategy.*

**17.** Implement measures to increase social distancing.

**18.** Review Influenza Outbreak Scenarios and Control Measures (*Attachment 1.1*) to assess the current status of an outbreak in the institution and identify appropriate control measures.

**19.** Continue staff and inmate training on infection control.

**20.** Monitor adherence to infection control guidelines.

**21.** Monitor daily use of infection control supplies and conduct daily inventory control.

---

### Recovery (Federal Response Stage 6)

---

*Previous flu pandemics have been associated with subsequent "waves" of flu after an initial wave resolves.  After an initial pandemic flu outbreak, subsequent outbreaks are likely.  The recovery period will involve both recovering from the pandemic emergency, evaluating the BOP response to it, and preparing for subsequent waves of pandemic flu.*

**1.** Maintain surveillance for influenza (to detect subsequent waves of pandemic influenza).

**2.** Evaluate the effectiveness of surveillance and infection-control measures during the pandemic flu and summarize observations.

**3.** Evaluate the adequacy of infection control supplies and the need for restocking.

**4.** Restock infection control supplies.

**Module 1:  Surveillance and Infection Control**
# Standard Operating Procedures for Preparation Stage
## (Federal Response Stages 0–1)

| |
|---|
| During the Preparation stage, adapt this Standard Operating Procedure template to the unique circumstances of your facility.  A modifiable Word version is posted on: *www.bop.gov/news/medresources.jsp*. |

| | |
|---|---|
| **1.** | **Identify staff persons responsible for planning for and directing health care delivery during pandemic influenza.** |

| |
|---|
| In this facility, the following individual is assigned responsibility: |

| | |
|---|---|
| **2.** | **Increase emphasis on the triad of good health habits to stop flu transmission:  hand washing, respiratory etiquette, and not touching the eyes, nose and mouth.** |
| **a.** | **Make soap dispensers or hand soap available in all employee and inmate restrooms,** as follows: |
| **b.** | **Institute a plan to assure that soap dispensers are refilled regularly,** as follows: |
| **c.** | **Assure that inmates have an adequate supply of bar soap,** as follows: |
| **d.** | **Provide education to employees and inmates on hand hygiene, respiratory etiquette, and avoiding touching the eyes, nose, and mouth.** |

| |
|---|
| Employees will be provided regular education as follows: |
| Inmates will be provided regular education as follows: |
| Posters on hand hygiene and respiratory etiquette will be placed in the following locations: |

| | |
|---|---|
| **e.** | **Maximize access to alcohol-based hand rub dispensers in the Medical Unit** (only if authorized by the warden) as follows: |
| **f.** | **Regularly assess the hand hygiene practices of employees and inmates, and design measures to improve hand hygiene.**  Implement systems for assessing adherence to hand hygiene as follows: |

| |
|---|
| For health care workers: |
| For other correctional workers: |
| For inmates: |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

| | |
|---|---|
| g. | **Assure that employees and visitors can wash their hands when entering and leaving the facility,** as follows: |

| | |
|---|---|
| **3.** | **Emphasize frequent cleaning and disinfection of high touch areas.** |

| | |
|---|---|
| a. | Identify "high-touch" surfaces in this facility (i.e., door knobs, keys, telephones): |
| b. | The following plan will be implemented to increase frequency and the extent of cleaning and disinfection of high-touch surfaces in this facility: |

| | |
|---|---|
| **4.** | **Identify resources for influenza surveillance.** |

| | |
|---|---|
| a. | **Track international, national, regional, and local influenza trends, utilizing the following resources.** Increase frequency of monitoring when pandemic flu is reported outside North America. <br><br> Federal Bureau of Prisons Intranet: *http://sallyport.bop.gov* <br> Federal Web sites on pandemic influenza: *http://www.flu.gov/* <br> Centers for Disease Control and Prevention: *www.cdc.gov/flu/weekly/fluactivity.htm* |
| b. | **Identify public health department contacts for influenza (include 24/7 contact info.)** |

| | |
|---|---|
| **Local County/Community Public Health Contact:** | |
| Address: | |
| Phone/email: | |
| **State Health Department Contact:** | |
| Address: | |
| Phone/email: | |

| | |
|---|---|
| c. | **Communicate with your local health department and discuss collaboration on pandemic influenza preparedness.** Document the plans discussed. |
| d. | **Identify any local or state reporting requirements for influenza/pandemic influenza.** <br> ☐ No reporting requirements <br><br> ☐ Influenza reporting requirements for _____ <jurisdiction> are: <br> (Also attach required reporting forms.) |
| e. | **Identify laboratories capable of processing influenza specimens and specimens for novel (pandemic) influenza.** |
| | ☐ Attach copy of procedures for obtaining influenza specimens for your lab. |

13

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

| | Reference Lab | State Lab |
|---|---|---|
| **Laboratory Name** | | |
| **Contact Person** | | |
| **Address** | | |
| **Telephone** | | |
| **FAX** | | |
| **email** | | |

| | |
|---|---|
| **5.** | **Begin tracking influenza trends by conducting surveillance for *seasonal* flu.** |
| **a.** | **Initiate routine data collection on inmates with identified influenza-like illness (ILI).**  Enter data on occurrence of ILI in the BOP Electronic Medical Record.<br><br>***Note:*** *Influenza-like illness (ILI) is defined as "fever (temperature of 100° F [37.8° C]) plus either cough or sore throat—in the absence of a known cause other than influenza."*<br><br>In this facility, surveillance for influenza-like illness (ILI) will be accomplished as follows:<br><br><br> |
| **b.** | **Obtain influenza specimens** when there is atypical clinical presentation of flu or when an individual is hospitalized for severe respiratory illness during flu season.<br><br>*Note: There is no need to collect specimens during an ongoing influenza outbreak.* |
| **c.** | **Compile annual summary reports on seasonal influenza cases (Oct. 1 – Apr. 30).**  Review annual ILI statistics with the Infection Control Committee. . |
| **6.** | **Establish procedures for influenza screening to be utilized with pandemic flu.** |
| **a.** | **New Inmate Arrivals:**   Employees shall be assigned to screen all new arrivals, using the *Influenza-Like Illness Screening Form (Attachment 1.3)*.  This screening will include taking the inmate's temperature and asking questions about symptoms.  If the inmate's condition meets the clinical definition of influenza-like illness, then further questions shall be asked to identify risk factors for pandemic influenza.  Ideally, screening will take place individually as the inmates are departing the bus, prior to entering the holding area.  Depending on weather conditions and physical layout, this may not be feasible.  Plans for screening should be adapted to the particular situation at each facility, with the goal of keeping the new arrivals segregated from other inmates, until the screening process has been completed.<br><br>The plan for screening new inmate arrivals in this facility is:<br><br><br> |
| | If ILI is identified in an arriving inmate the following should occur:<br>  • Place a face mask on the inmate.<br>  • Walk the inmate to the designated influenza isolation area.<br>  • Quarantine all inmates arriving on the same bus in one area of the facility, for 4 days. |

**b. Triage/Sick-Call:** During the Response stage, inmates who come to sick-call/triage will be screened for flu symptoms as follows:

Any inmate who has flu-like symptoms will be asked to wear a mask and will be separated from other waiting inmates. If there is any evidence of epidemiologic risk for flu, the inmate should be isolated. (For more detail on infection control, isolation, and quarantine, see *Attachment 1.7*.)

**c. General Inmate Screening:** After cases of pandemic flu are reported, more intensive screening of the general population may be warranted. This may include obtaining screening temperatures and conducting symptom screens, as well as advising correctional officers to report any symptomatic inmates. Strategies for general screening for flu symptoms will include:

**d. Employee Screening:** Employees will be asked to stay home from work if they become sick with flu symptoms and to voluntarily report flu symptoms if they occur on the job.

The following system will be utilized to track and report employee illness during a pandemic flu outbreak:

**7. Identify administrative measures to accomplish "social distancing."**

Discuss use of various administrative measures to accomplish social distancing to prevent pandemic flu transmission in this facility.

**a. Identify general "social distancing" measures.** The following are possible measures:
- limit gatherings (group meals, religious services, work, classes, recreation, common areas)
- no handshaking
- stop visitation, volunteers, contractors
- limit contact between the well and the ill
- lock-downs
- providing recreation and dining separately by unit (with disinfection in-between)

The following additional social distancing measures could be utilized in this facility:

**b. Separate the sick from the well in triage/sick-call.** During pandemic flu, the following methods will be used to separate inmates with the flu from inmates with other health problems:

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

---

**8.   Identify areas within the facility that can be used for isolation and quarantine.**

Identify places within your facility where inmates who have pandemic flu, or who have been in contact with flu patients, can be appropriately housed, e.g., wards, gymnasium, cafeteria.

***Definitions:***

• ***Isolation:***  Confining influenza cases (either to a single room or by cohorting them with other influenza patients) to decrease the likelihood of influenza transmission.

• ***Quarantine:***  Confining persons who are contacts of influenza cases, while they are in the incubation period (usually 4 days after exposure ended).

Depending on how ill the inmates are, bunk beds may not be suitable.  Isolation and quarantine units do not require special air handling.  Ideally, these units have an attached bathroom.  (If not, inmates must wear a mask while outside the isolation or quarantine unit.)  If feasible, beds/cots in quarantine units should be placed at 3–6 feet apart to decrease the likelihood of flu transmission.  List possible locations for isolation and quarantine in the chart below.

| Type of Room | Location(s) | Capacity (# of inmates) |
|---|---|---|
| Isolation (Single) | | |
| Isolation (Cohort) | | |
| Quarantine (Contacts) | | |

☐   Review procedures for pandemic influenza precautions in *Attachment 1.7* and *1.8* and be prepared to implement them.

☐   Review procedures and forms for contact investigation and quarantine in *Attachment 1.8* and *1.9* and be prepared to implement them.

**9.   Develop plans for stockpiling and distributing infection control supplies.**

**a.**   Assure that stockpiling of hand hygiene supplies and masks is consistent with guidance from the Central Office.  Develop plans for storage of supplies.  ***For security reasons, do not record the storage location in this document.***

**b.**   Indicate the quota for supplies based on Central Office guidance:

• Liquid or foam hand soap          Quota: ____

• Alcohol-based hand rub            Quota: ____

• Face masks                       Quota: ____

• Bar soap                         Quota: ____

• N-95 respirators                 Quota: ____

• Gloves                           Quota: ____

**c.** The general plan for overseeing and managing stockpiled supplies is outlined below.

- The plan for rotating stock of supplies is:

- The plan for securing supplies is:

- The plan for distributing hand hygiene supplies during pandemic flu is:

- The plan for distributing and replacing face masks for inmates and employees during pandemic flu is:

**d.** Develop plans for conducting respirator fit-testing for staff who will be assigned responsibility for caring for pandemic flu patients.

**10. Provide routine training about flu transmission, and prevention and control measures.**

The plan for providing ongoing training about flu transmission, and prevention and control in this facility is:

**11. Conduct mock exercises related to surveillance and infection control in pandemic flu.**

Mock exercises will be conducted as follows:

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.1.  BOP Pandemic Influenza Outbreak Scenarios and Control Measures

The following chart outlines recommendations for infection control measures based on the outbreak scenario, i.e., the number and distribution of cases of ILI in an institution.  These recommendations are provided for general reference only.  Each outbreak situation is unique.  Consult with the Regional Office regarding management of specific outbreaks.

| CONTROL MEASURE | OUTBREAK SCENARIO | | |
| --- | --- | --- | --- |
| | ISOLATION *Single case(s) of ILI with minimal to no transmission* | QUARANTINE *ILI confined to single housing unit(s) or building* | WIDESPREAD TRANSMISSION *Multiple cases of ILI throughout institution* |
| CONTAINMENT GOAL | Prevent spread *into* institution. | Prevent spread throughout *institution/complex.* | Prevent spread *throughout* BOP. |
| ISOLATION OF ILI CASES | Isolate inmates with ILI in Influenza Isolation Units. | Isolate/cohort inmates with ILI, as feasible. | Cohort inmates with ILI (may not be possible). |
| QUARANTINE OF FLU CONTACTS | Not applicable. | Quarantine asymptomatic contacts of flu cases, as feasible. | Quarantine not indicated. Entire institution is, in effect, "quarantined." |
| RESPIRATORY PROTECTION* | Face masks or respirators in Influenza Isolation Units.* | • Face masks or respirators in Influenza Isolation Units.*<br>• Face mask for direct, close contact (within 6 feet) with quarantined inmates. | • Use face masks or respirators when in close contact with symptomatic inmates.*<br>• Consider strategic distribution of face masks.** |
| SCREENING | Screen intakes. | • Screen intakes.<br>• Screen inmates before transfer.<br>• Screen contacts daily.<br>• ILI case-finding throughout facility. | ILI case-finding throughout facility. |
| VISITORS: *Visitors with ILI symptoms restricted* | No visitor restrictions except for flu case(s). | Visitor restrictions for quarantined units/buildings. | No visitors. |
| ANTIVIRAL TREATMENT | For high-risk. | For high-risk. | For high-risk. |
| CARE FOR SICK | • Push fluids.<br>• Observe closely. | • Push fluids.<br>• Observe closely. | • Push fluids.<br>• Observe closely. |
| ANTIVIRAL PROPHYLAXIS | • Pregnant close contacts.<br>• Consider for high-risk close contacts. | • Pregnant close contacts.<br>• Consider for high-risk close contacts. | • Pregnant close contacts.<br>• Consider for high-risk close contacts.<br>• Consider for staff if severe staff shortages.** |
| TRANSFERS | No transfers of flu cases. | No transfers into or out of quarantined units. | No transfers into or out of institution. |

*\* The decision regarding the need for respirators vs. face masks will be based on guidance from the Medical Director.*
*\*\* Only with the permission of the BOP Medical Director or designee.*

## Attachment 1.2.  Use of BEMR to Track Influenza-Like Illness (ILI)

The BOP Electronic Medical Record (BEMR) will permit real-time tracking of the occurrence of influenza-like illness (ILI) during the course of pandemic influenza.  On a daily basis, information about the occurrence of ILI and associated events should be entered into BEMR.

| Pandemic H1N1 Influenza BEMR Codes and Definitions | |
|---|---|
| 488.1 A | **Influenza-Like Illness (ILI)**<br><br>*Definition:*  Fever (temperature of 100°F [37.8°C] or greater)—plus cough or sore throat—in the absence of a known cause for these symptoms other than influenza. |
| 488.1 B | **Influenza-Like Illness – Complicated**<br><br>*Definition:*  Inmates coded as meeting the definition of ILI (BEMR 488.1 A) who require treatment with prescription medication or intravenous fluids. |
| 488.1 C | **Influenza-Like Illness Related Hospitalization**<br><br>*Definition:*  Inmates coded as meeting the definition of ILI (488.1A) who are hospitalized during the course of ILI. |
| 488.1 D | **Influenza-Like Illness Related Death**<br><br>*Definition:* Inmates coded as meeting the definition of ILI (488.1A) who expire during the course of ILI or subsequent complications. |

Do not change codes once they have been entered.   For example, for a person who has been hospitalized, do not delete the code for hospitalization when the person returns to the facility.

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.3.  Influenza-Like-Illness (ILI) Screening Form

This form is designed to screen inmates for influenza-like illness.  If pandemic influenza is circulating outside the facility, then all intakes should be screened.  If pandemic influenza has been identified within the facility then screening should occur at triage/sick-call and prior to all transfers/transports.

**Date:** ___/___/____   **Time:** ___:___

| SUBJECTIVE/OBJECTIVE |
|---|

1. **Temperature** _____   Date of onset: ___/___/___

2. **Do you have any of the following symptoms:**
   - ☐ Cough
   - ☐ Sore Throat
   - ☐ None of the above

3. **In last 4 days, have you had close contact with anyone with flu symptoms** (fever, cough, sore throat)?
   ☐ No  ☐ Yes
   Describe: _____

4. **Level of awareness:** ☐ Alert  ☐ Confused  ☐ Lethargic
   **Oriented to:** ☐ Person  ☐ Time  ☐ Place

| ASSESSMENT |
|---|

☐ **Inmate meets criteria for influenza-like illness (ILI).**
   ILI is defined as: *temperature greater than 100° F (37.8° C) and presence of cough or sore throat.*
☐ **Asymptomatic inmate with history of close contact with someone with ILI**
☐ **Absence of influenza symptoms**
☐ **Other:** _____

| PLAN |
|---|

☐ No influenza-related restrictions

***If clinical criteria for ILI met (see Assessment above):***
☐ Provide inmate with face mask
☐ Transport inmate to Influenza Isolation Unit
☐ Educate inmate about:  ☐ Use of mask  ☐ Disposal of mask  ☐ Cover cough/sneezes
                              ☐ Hand washing

***If history of recent ILI exposure:***
☐ Quarantine in Influenza Quarantine Unit (for 4 days)

| Date: | Staff Signature &  Stamp: |
|---|---|
| Institution: | Patient Identification: |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.4.  Correctional Standard Precautions – General Population

| The following precautions should be observed *routinely* by all correctional workers at all times to prevent spread of disease. *(General population refers to all correctional settings except health care settings.)* | | |
|---|---|---|
| **Component** | **Indicated (X)** | **Recommendations** |
| **Hand washing** | X | Wash hands routinely with soap and running water for at least 15 seconds:  before eating, after using the bathroom, when hands are dirty, and after contact with blood or other body fluids. |
| **Respiratory hygiene** | X | Cough/sneeze into sleeve or cover mouth/nose with tissue.  Dispose of used tissues (in regular trash).  Persons who are coughing or sneezing can use a paper mask to prevent spray.  Wash hands after coughing or sneezing. |
| **Safe practices** | X | Avoid touching eyes, nose, and face. Germs are spread by touching your face. |
| **Personal protective equipment (PPE)** | Not routinely | Personal protective equipment is indicated only if contact with blood/body fluids is likely. PPE includes gloves to protect hands from contact; mask, face/eye wear, and gowns to protect from sprays and splashes. |
| **Sharps** | X | Dispose in a leak-proof, puncture-resistant container.  Never recap, bend, break, or otherwise manipulate used needles. |
| **Single cell** | Not routinely | Place potentially infectious inmates in a private room (in consultation with medical staff).  Consider single cells for inmates with poor hygiene practices. |
| **Sanitation** | X | Routinely clean with an EPA registered disinfectant (see (http://www.epa.gov/oppad001/chemregindex.htm).  Use according to the manufacturer's instructions.  All washable (non-porous) surfaces should be cleaned during and after (terminal) cell occupancy.  Correctional workers should conduct sanitation inspections of living and bathroom areas to identify visibly dirty areas.  Emphasize regular cleaning of  surfaces that are frequently touched (hand-rails, elevator buttons, door knobs, computer key boards, etc.). |
| **Laundry** | X | Collect at bedside.  If wet or soiled, handle between as little as possible; bag in a leakproof bag at the location in which it was used, in accordance with local policy on management of linens.  Machine wash and dry. |
| **Activities (shared equipment)** | X | Weight benches or any other surface exposed to sweat should be *disinfected daily*, and *routinely wiped clean between users* with a clean dry towel.  Inmates should use barriers to bare skin, such as a towel or clean shirt, while using exercise equipment. |
| **Report possible infections** | X | Correctional workers who observe evidence of possible infections should report them promptly to their supervisor.  Inmates with possible skin infections should be sent promptly for a medical evaluation. |

## Attachment 1.5.  Correctional Standard Precautions – Health Care Settings

| All workers in health care settings should observe the following precautions *routinely*. | |
|---|---|
| **Components** | **Recommendations** |
| **Hand hygiene** | *Hand hygiene is the most important measure to reduce transmission of infectious diseases.* Perform hand hygiene after touching blood or body fluids, after removing gloves, and between patient contacts.  Hand hygiene includes handwashing with either plain or antimicrobial soap and water, as well as use of alcohol-based products (if approved by the warden).  If hands are visibly soiled or contaminated, they should be washed with soap and water. |
| **Respiratory etiquette** | Educate staff, inmates, and visitors on the importance of containing respiratory secretions.  Post signs with instruction on reporting  influenza-like illness.  Cough/sneeze into sleeve or cover mouth/nose with a tissue, disposing of used tissues in regular trash.  Have persons who are coughing or sneezing use a paper mask to prevent spray.  Hand hygiene after coughing/sneezing. |
| **Personal protective equipment (PPE)** | **Gloves:**  For touching blood, body fluids, secretions, excretions, and contaminated items; for touching mucous membranes and nonintact skin.<br>**Gown:**  During procedures and patient-care activities where there is a possibility of contact of clothing/exposed skin with blood/body fluids, secretions, and excretions.<br>**Face/eye protection** (e.g., face mask, goggles, or face shield)**:**  During patient care activities likely to generate splash/spray of blood, body fluids, secretions, or excretions. |
| **Safe work practices** | Avoid touching eyes, nose, mouth, or exposed skin with contaminated hands (gloved or ungloved); avoid touching surfaces that are not directly related to patient care (e.g., door knobs, keys, light switches) with contaminated gloves and other personal protective equipment. |
| **Patient resuscitation** | Avoid unnecessary mouth-to-mouth contact.  Use mouth piece, resuscitation, or other ventilation device to prevent contact with mouth and oral secretions. |
| **Patient care equipment** | Handle in manner that prevents transfer of microorganisms to oneself/others and to environmental surfaces.  Wear gloves if visibly contaminated; perform hand hygiene. |
| **Soiled linen & laundry** | Handle in a manner that prevents transfer of microorganisms to oneself/others and to environmental surfaces.  Wear gloves (and gown, if necessary) when handling and transporting soiled linen and laundry.  Perform hand hygiene. |
| **Needles & other sharps** | Use devices with safety features when available; do not recap, bend, break, or manipulate used needles.  If recapping is necessary, use a one-handed scoop technique; place used sharps in a puncture-resistant container. |
| **Environmental cleaning & disinfection** | Use EPA-registered hospital detergent disinfectant. Follow standard facility procedures for cleaning and disinfecting environmental surfaces.  Emphasize cleaning/disinfection of frequently touched surfaces (e.g., bed rails, phones, lavatory surfaces).  Change solutions regularly and clean the container to prevent contamination.  Ensure patient care items and potentially contaminated surfaces are cleaned and disinfected after use.  Use barrier-protective coverings, as appropriate, for surfaces that are touched frequently with gloved hands during patient care, that may become contaminated with blood/body fluids, or that are difficult to clean. |
| **Disposal of solid waste** | Contain and dispose of solid waste (medical and non-medical) in accordance with facility procedures and/or local or state regulations.  Wear gloves when handling waste and when handling waste containers.  Perform hand hygiene. |

## Attachment 1.6.  Influenza Infection Control – General Population

| The following guidelines are generally recommended *at all times* and should be emphasized during an influenza outbreak. |
|---|
| (*General population* refers to all correctional settings except *health care settings*.) |

### Wash hands regularly and carefully!

- *Hand washing is the most important way to prevent transmission of the flu.*
- Wash hands regularly with soap and water (before meals, after using the toilet, and after contact with blood or body fluids).
- Wash for at least 15 seconds, in between fingers and on both sides of hands.

### Cover mouth and nose when sneezing or coughing.

- Cough into sleeve or tissue.  Dispose of tissues properly.
- Wash hands after coughing or sneezing.
- Place a face mask on an inmate who is repeatedly coughing or sneezing.

### Avoid touching eyes, nose, and mouth.

- Surfaces can be contaminated with the flu virus (for example another person's hand or door knob).  Touching such surfaces and then touching the eyes, nose, or mouth can lead to infection.

### Clean environmental surfaces regularly, especially "high touch" surfaces.

- Use EPA approved disinfectants.
- Emphasize cleaning frequently touched surfaces, such as door knobs, railings, light switches, and phones.
- All washable (nonporous) surfaces should be cleaned during and after (terminal) cell occupancy.  Correctional workers should conduct sanitation inspections of living and bathroom areas.

### Handle laundry carefully.

- Wear gloves and protective clothing when handling soiled linen.
- Wash hands afterwards.
- Machine-wash in hot water and completely dry the laundry.

### Wear gloves when touching blood or body fluids.

- Wear gloves whenever contact with blood, body fluids, or contaminated items is likely.  Wash hands after removing gloves.

### Report symptoms of the flu.

- Flu symptoms include fever, cough, shortness of breath, and sore throat.
- Report to a supervisor if inmates or other employees develop flu symptoms.

### Follow these procedures with flu patients.

- Inmates with flu symptoms should be given a face mask to wear.
- Flu patients should be housed separately from other inmates.

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.7.  Pandemic Influenza Precautions – Health Care Settings

Page 1 of 2

| The following precautions should be used in conjunction with *Standard Precautions* (see *Attachment 1.5*) when in contact with *patients suspected of having pandemic influenza*. | |
| --- | --- |
| **Components** | **Recommendations** |
| **Hand hygiene** | • **Hand hygiene is the number one defense.** Wash hands for 15–20 seconds.<br>• Includes using plain or antimicrobial soap and water, or alcohol-based products.<br>• Perform hand hygiene after touching blood/infectious body fluids, secretions, excretions, and contaminated items; after removing gloves; and in-between patients.<br>• Use soap and water if hands are visibly soiled or have touched respiratory secretions.<br>• Wash hands prior to putting on personal protective equipment (e.g., respirator or gloves), and after removing any protective devices.  Avoid touching the outside of a contaminated device. |
| **Safe work practices** | • Avoid touching eyes, nose, mouth, or exposed skin with hands (gloved or ungloved).<br>• Avoid touching surfaces (e.g., door knobs, keys, light switches) with contaminated gloves or other personal protective equipment that is directly related to patient care. |
| **Respiratory etiquette** | • Promote coughing or sneezing into one's sleeve or crook of elbow (rather than hands).<br>• Provide tissues and no-touch (open) trash container. |
| **Patient waiting areas** | • Implement system to identify/triage inmates with influenza-like illness (ILI).<br>• Spatially separate inmates with ILI from others.  Place face mask on inmates with ILI. |
| **Patient placement** | • *Influenza Isolation Units:*<br>  • Isolate inmates with ILI in a private room or *cohort* groups of inmates with ILI in a specifically established, multi-bed unit.<br>  • No special air handling is required.  *Exception:* If aerosol-generating procedures are performed, an airborne-infection isolation (negative pressure) room is recommended.<br>  • Post sign indicating "Influenza Isolation Unit" with appropriate PPE (*Attachment 1.10*).<br>  • Depending upon how ill the inmates are, bunk beds may not be suitable.<br>  • Keep the door closed.  Ideally, have the bathroom attached to the room.<br>  • Wear fit-tested respirator or face mask (based on Medical Director guidance) and gloves for touching contaminated surfaces.  For additional PPE recommendations, see page 2 of this table.<br>  • If feasible, have ILI patients wear a face mask when in close contact with workers.<br>• *Isolation Duration:*  Isolate until 24 hours after fever resolved.  In Medical Referral Centers, isolate for 7 days after symptom onset or until symptoms resolved (whichever is longer).<br>• *Note:*  See 2nd page for recommendations about quarantine of inmates who are exposed to ILI. |
| **Staffing** | • Limit the number of caregivers per inmate.  Ideally, staff caring for inmates with ILI are not assigned to take care of inmates with other (non-flu-related) health care problems.<br>• Staff with symptoms of influenza-like illness should not come to work.<br>• Asymptomatic health care workers who have had an unprotected exposure to an individual with ILI (at home or at work) should report their exposure to their supervisor.  In general, exposed health care workers should not work with patients at high risk for influenza complications–for the 4 day period after exposure ended–unless they receive post-exposure antiviral prophylaxis. |
| **Visits/social** | • No visitation/social gatherings.  Create as much distance as possible between people. |
| **Patient transport** | • Limit patient movement outside of the Influenza Isolation Unit to medically necessary purposes.<br>• Have the patient wear a face mask (without an exhalation valve) when outside the unit.  If mask can't be tolerated, apply most practical measures to contain respiratory secretions, e.g., handkerchief over nose/mouth, etc.<br>• Patients should wash hands before leaving the unit and after a mask is removed. |
| **Transport vehicles** | • Transporters should wear a face mask or a fit-tested respirator (based on guidance from the Medical Director).  Wash hands afterwards.<br>• Optimize vehicle ventilation to increase the volume of air exchange during transport.<br>• Routinely clean the vehicle with an EPA-disinfectant following the transport. |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.7.  Pandemic Influenza Precautions – Health Care Settings

| Components | Recommendations |
|---|---|
| **Personal Protective Equipment (PPE) for Influenza Isolation Units** ||
| *The PPE guidelines listed directly below apply only to Influenza Isolation Units, not Quarantine Units.*<br>➔ *Careful placement of PPE before patient contact will avoid the need*<br>*to make adjustments and risk self-contamination during use.* ||
| **Respiratory Protection**<br><br>The use of face masks vs. respirators in a pandemic will be based on guidance from the Medical Director. | • *Face masks or respirators (N-95 or higher filtering) should be worn when inside an Influenza Isolation Unit* (based on guidance from the Medical Director).<br>  • Respirators must be worn in the context of an OSHA Respiratory Protection Program (29 CFR 1910.034).<br>  • Medical evaluation, training, and fit-testing of respirators are required prior to initial use.<br>  • Respirators cannot be used with facial hair.<br>  • Respirators are provided at no cost to the employee.<br>• *General guidance regarding respirator use:*<br>  • Wash hands prior to donning and after removing mask or respirator.<br>  • To reduce spread of germs, do not leave dangling around the neck.<br>  • Respirators are not needed when using "food slot."<br>  • Respirators should be disposed of if:  the respirator becomes physically damaged; the integrity of the respirator is impaired; or the respirator becomes potentially contaminated during an aerosol generating procedure (e.g., nebulizer treatment or suctioning) or when in close contact with a patient who fails to cover a cough or sneeze.  There is no need to dispose of respirator if merely walking through Influenza Isolation Unit, e.g., for census count.<br>  • Respirators should be individually stored in a clean and dry container or plastic bag, stored to prevent damage to the respirator, and labeled with the name of the staff person to whom it is assigned.  Otherwise the respirator should be disposed of at the end of a shift.<br>• *If respirators are in short supply*, they should be prioritized for situations associated with higher risk for transmission, e.g., aerosol-generating procedures (e.g., suctioning, nebulizer treatments); resuscitation of a patient; providing direct care to a patient with confirmed or suspected pneumonia who might produce larger-than-normal amounts of secretions when coughing.<br>• *If there is a significant shortage of respirators*, CDC indicates that face masks may be considered an alternative to respirators. |
| **Gloves** | Gloves should be worn for all interactions that may involve contact with the patient or potentially contaminated areas in the patient's environment.  Gloves should be worn when picking up meal trays used by ill inmates.  Wash hands after removing gloves. |
| **Gowns & Eye Protection** | Gowns and eye protection should be worn if spray or splash of body fluids (including respiratory secretions) is anticipated, i.e., suctioning or nebulizer treatments.<br>Eye protection consists of appropriately fitted, indirectly vented goggles or a face shield. Eye glasses are not sufficient. |
| **Guidelines for Influenza Quarantine Units** ||
| **Quarantine**<br>**(ILI-exposed inmates with no symptoms)** | • House inmates exposed to a person with suspected pandemic flu (no ILI symptoms) in a designated Influenza Quarantine Unit, with beds/cots 3–6 feet apart, as feasible.<br>• Restrict contact with non-exposed persons.<br>• If asymptomatic, release after 4 days (unless re-exposure occurs).<br>• A face mask—not a respirator—is recommended when in close contact (within 6 feet).<br>• Monitor for temperature and influenza signs and symptoms at least daily.<br>• Quarantine may be unrealistic if pandemic influenza becomes widespread. |

## Attachment 1.8.  Pandemic Flu Contact Investigation/Quarantine Procedures

When a case of influenza is identified, the following steps should be followed in conducting a contact investigation.

1) **Determine the infectious period** (from 24 hours before symptom onset until contact with the influenza case ended--usually the date the case was isolated).

2) **Identify closest contacts (cell mates, work-mates, friends) and other housing unit contacts.**

   For the purposes of this document, exposure is defined has having been in a setting where there was a high likelihood of contact with respiratory droplets and/or body fluids of a person with ILI.  Examples of close contact include sharing eating or drinking utensils, or any other contact between persons likely to result in exposure to respiratory droplets.  Close contact typically does not include activities such as walking by an infected person or sitting across from a symptomatic patient in a waiting room or office.

   Use *Attachment 1.9, Pandemic Flu Contact Investigation/Quarantine Line List* to list names of contacts and the outcome of their exposure.

3) **Screen contacts for temperature and cough or sore throat** recording results on the line-listing.  Isolate any contacts who develop ILI symptoms.

4) **Decide which groups of contacts to quarantine.**  There is no simple answer regarding who should be quarantined.  Often the simplest measure is to quarantine the entire housing unit.  If that is impractical, quarantine the inmates with the closest contact.

5) **Quarantine of exposed contacts should be maintained for 4 days after exposure ended (or the case was isolated).**

6) **Screen quarantined contacts daily for temperature and signs and symptoms (S/S), i.e., presence of cough or sore throat**, recording results on the quarantine line list.

7) A face mask should be worn in the quarantine room if close contact (within 6 feet) of quarantined inmates is anticipated.  Face masks do not require fit-testing.

*Note:*  If multiple influenza cases occur within multiple housing units, *a decision may be made to abandon contact investigations and quarantine as a control strategy*.  In this case, everyone has become a contact and contact investigation is not a useful strategy.

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.9.  Pandemic Flu Contact Investigation/Quarantine Line List

Facility: _____   Staff Contact Name: _____   Phone: _____   ILI Case Reg. No. _____

**Index Case:**  Quarters: _____   Work: _____   Education: _____
Recent Travel/Movement: _____   Case Symptom Onset Date: ___/___/___
Date ILI Case Isolated: ___/___/___ + 4 Days = ___/___/___ (date to discontinue quarantine)

| # | Bed # | Last Name, First Name / Registration Number | Exposure Site (1–5)* | Date:** / Quarantine Date | Time:** | | | | Anti-viral Prophy? / Start Date | Comments | Cleared (C) or Sick (S) / Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y  N | | C   S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |

\* (1) Quarters, (2) Work, (3) Education, (4) Travel, or (5) Other
\*\*At the top of the chart, write the date and time that the contact's temperature and signs/symptoms (S/S) were checked.
Use that column to record the contact's temperature and whether there were signs/symptoms of cough or sore throat.
*For complete instructions on filling out this form, see page 2  of Attachment 1.9.*

**Note:**  This is an optional form that can be used to track the screening of individuals who are identified contacts to influenza case(s).  If multiple influenza cases occur within multiple housing units, a decision may be made to abandon contact investigations and quarantine as a control strategy.  In this case, everyone has become a contact, and contact investigation is not a useful strategy.

Page ___ of ___

## Attachment 1.9.  (Instructions)

> The purpose of the optional **Attachment 1.9, *Pandemic Flu Contact Investigation/Quarantine Line List,*** is to track the outcome for contacts exposed to a case of pandemic influenza.  The form provides a record of exposure sites for a given index case with pandemic influenza and provides a place to record names of identified contacts.  Space is provided to record daily temperatures and signs and symptom checks, as well as the outcome of the quarantine.

**Facility:**  Facility code.

**Staff Contact Name/Phone:**  Infection Control Officer (ICO) or designee, and phone number.

**ILI Case Reg. No.:**  Registration number of the **index case**, the inmate who developed pandemic flu.

**Quarters:**  Place(s) where the index case was housed, beginning one day prior to symptom onset until isolated.

**Work:**  Index case's work assignment/group.  If none, record "none."

**Education:**  Index case's education classes/name of group.  If none, record "none."

**Recent Travel/Movement:**  Indicate locations if index case traveled or moved during infectious period.

**Case Symptom Onset Date:**  Date flu symptoms started.

**Date ILI Case Isolated:**  Date placed in isolation or cohorted.

**+ 4 days:**  Determine the date that is 4 days after the case was isolated (to calculate the date that healthy contacts can be released from quarantine).

**#:**  Assign each contact a sequential quarantine number.

**Bed #:**  Bed assigned to the contact.

**Last Name, First Name:**  Name of the inmate contact.

**Registration Number:**  Registration number of the inmate contact.

**Exposure Site:**  Use 1–5 to indicate site of exposure as (1) Quarters, (2) Work, (3) Education, (4) Travel, or (5) Other.

**Quarantine Date:**  Date contact was quarantined.

**Date** and **Time:**  At the top of the chart, record date and time that temperature and signs/symptoms were checked.

**Temp and S/S?:**  Temperature and signs/symptoms for each date/time recorded at the top of the chart. Daily, record the inmate's temperature; indicate the presence of any signs or symptoms of cough or sore throat by circling **Y** (yes) or **N** (no).  Use the **Comments** column to indicate type of flu symptom.

**Antiviral Proph?:**  Antiviral Prophylaxis. Indicate if antiviral prophylaxis was provided to the contact, circling **Y** (yes) or **N** (no).  If yes, indicate **Start Date**.

**Comments:**  Record any comments about the quarantined inmate.

**Cleared(C) or Sick (S):**  Indicate whether the patient is cleared after the 4-day quarantine period or becomes ill, by circling C (cleared) or S (sick).  Indicate the **Date** that the person was either released from quarantine or was isolated due to illness.

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.10.  Precaution Signs for Influenza Isolation and Quarantine Units

The signs on the following two pages should be posted when utilizing a room for isolation or quarantine:

- **Influenza Isolation Unit** sign should be used for rooms housing one or more inmates with influenza-like illness.
- **Influenza Quarantine Unit** sign should be used for rooms housing asymptomatic inmates who have been exposed to ILI.

# Influenza Isolation Unit

*Housing for inmates with influenza-like illness—*
*to separate sick inmates from inmates who are well*

# PRECAUTIONS:

## 1. Use: ☐Respirator   or   ☐Face Mask

 

› N-95 or better
› Must be fit-tested

## 2. Use gloves:

› For direct patient contact or contact with contaminated items.

## 3. Use eye protection/gowns:

› If splash or spray of body fluids is anticipated, e.g., suctioning or nebulizer treatments.
› Eye protection requires either goggles or face shield.

## 4. Perform hand hygiene frequently:

› Always before entering and when leaving room.
› After removing gloves.

## 5. Discontinue isolation…

› 24 hours after temperature remains normal (without fever-reducing medication).
› *For Medical Referral Centers only:* Discontinue isolation 7 days after onset of symptoms or when symptoms are resolved, whichever is longer.

# Influenza Quarantine Unit

*Housing for asymptomatic inmates who have been exposed to influenza-like illness—to separate them from inmates who are either sick or have not been exposed*

# PRECAUTIONS:

## 1. Wear a face mask:
### (not a respirator)



▸ Only if close contact with quarantined inmates (within 6 feet) is anticipated.

▸ No fit-testing is required.

## 2. Perform hand hygiene frequently:

▸ Always before entering and when leaving room.

## 3. Discontinue isolation…

▸ Isolation can be discontinued 4 days after the exposure to influenza-like illness ended, unless symptoms develop.

▸ If symptoms develop, isolate inmate in an *Influenza Isolation Unit*.

EXHIBIT 5

**INMATE COPY**

BP-A0291
NOV 12

**FURLOUGH APPLICATION   -   APPROVAL AND RECORD** CDFRM
Sequence: 94994

U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| Inmate's Name<br><br>OSBORN, TERRANCE | Register No.<br><br>23729-009 | Institution(address and phone number)<br>OKLAHOMA CITY FTC<br>P.O. BOX 898802<br>OKLAHOMA CITY, OK 73189<br>(405) 682-4075 |
|---|---|---|

## APPLICATION

| Purpose of Visit | Sentry Assignment<br>FURL TR NC | Date/Time of Departure | Date/Time of Return<br>N/A |
|---|---|---|---|

Furlough Address (include name of responsible party if applicable):
FORREST CITY FCI LOW - SATELLITE CAMP, 1400 DALE BUMPERS ROAD, FORREST CITY, AR 72335

Telephone No. (Including Area Code): 870-630-6000

| Point of Contact for<br>Emergency<br>OKLAHOMA CITY FTC | Method of Transportation<br>POV | Detainer/Pending<br>Charges ___Yes  ✓ No | Verified by (CSM Staff)<br>Russell, Christy |
|---|---|---|---|

NOTE TO APPLICANT: You are reminded that should any unusual circumstances arise during the period of your visit, you should notify the institution immediately at telephone: (405) 682-4075

## UNDERSTANDING

I understand that if approved, I am authorized to be only in the area of the destination shown above and at ordinary stopovers or points on a direct route to or from that destination.   I understand that my furlough only extends the limits of my confinement and that I remain in the custody of the Attorney General of the United States.   If I fail to remain within the extended limits of this confinement, it shall be deemed as escape from the custody of the Attorney General, punishable as provided in Section 751 of Title 18, United States Code.   I understand that I may be thoroughly searched upon my return to the institution and that I will be held responsible for any item of contraband or illicit material that is found.   I have read or had read to me, and I understand that the foregoing conditions govern my furlough, and will abide by them.   I have read or had read to me, and I understand the CONDITIONS OF FURLOUGH as set forth on the reverse of this form.

See Signature Page, BP-A0291IS                                    See Signature Page, BP-A0291IS

_____          OSBORN, TERRANCE
Witness                                  _____
R. BUIE, UNIT SECRETARY                  Signature of Applicant
_____          07/31/2019
Title                                    Date Signed

## ADMINISTRATIVE ACTION

| Information Verified by S. GIBSON | Title CASE MANAGER |
|---|---|
| Name Of USPO Notified N/A | Date of Notification 07/31/2019 |

Does USPO Have Any Objections to Furlough? (If so, explain) N/A

## APPROVAL

| Approval for the above named Inmate to leave the Institution on a furlough as outlined is hereby granted in accordance with P.L. 93-209 and the BOP Furlough Program Statement.   The period of furlough is<br>from 09/04/2019 10:00    to 09/04/2019 18:30 | As CMC, I have reviewed the Request for Activity Clearance (404) and the SENTRY CIM Clearance and Separatee Data and I recommend the inmate be approved to participate in this furlough.<br><br>✓ Yes  ☐ No Signature of CMC Scott Kesler |
|---|---|

Chief Executive Officer (Name & Date) - Approval and signature certifies CIMS Clearance
✓ Approval ☐ Disapproval Carter, Timothy, Acting Warden, 08/02/2019
Reason(s) for disapproval:

## RECORD

| Date/Time Released: | Date/Time Returned: N/A |
|---|---|

Travel Schedule:
DEPART FTC 9/4/19 @ 10:00 AM VIA POV DRIVEN BY BRIDGETTE HENNINGS (COUSIN).
ARRIVE FOR SCP NLT 6:30 PM.



Sequence: 94994

Inmate's Photo
**Conditions of Furlough**

(a)  An inmate who violates the conditions of a furlough may be considered an escapee under 18
     U.S.C. § 4082 or 18 U.S.C. § 751, and may be subject to criminal prosecution and institution
     disciplinary action.
(b)  A furlough will only be approved if an inmate agrees to the following conditions and
     understands that, while on furlough, he/she:
     (1)  Remains in the legal custody of the U.S. Attorney General, in service of a term of
          imprisonment;
     (2)  Is subject to prosecution for escape if he/she fails to return to the institution at
          the designated time;
     (3)  Is subject to institution disciplinary action, arrest, and criminal prosecution for
          violating any conditions(s) of the furlough;
     (4)  May be thoroughly searched and given a urinalysis, breathalyzer, and other comparable
          test, during the furlough or upon return to the institution, and must pre-authorize the
          cost of such test(s) if the inmate or family members are paying the other costs of the
          furlough.  The inmate must pre-authorize all testing fee(s) to be withdrawn directly
          from his/her inmate deposit fund account;
     (5)  Must contact the institution (or United States Probation Officer) in the event of
          arrest, or any other serious difficulty or illness; and
     (6)  Must comply with any other special instructions given by the institution.

     **Special Instructions:**

          It has been determined that consumption of poppy seeds may cause a positive drug test
          which may result in disciplinary action.  As a condition of my participation in
          community programs, I will not consume any poppy seeds or items containing poppy seeds.
          (Note: Additional conditions may be added to Special Instructions as
          warranted).
(c)  While on furlough, the inmate must not:
     (1)  Violate the laws of any jurisdiction (federal, state, or local);
     (2)  Leave the area of his/her furlough without permission, except for traveling to the
          furlough destination, and returning to the institution;
     (3)  Purchase, sell, possess, use, consume, or administer any narcotic drugs, marijuana,
          alcohol, or intoxicants in any form, or frequent any place where such articles are
          unlawfully sold, dispensed, used, or given away;
     (4)  Use medication that is not prescribed and given to the inmate by the institution
          medical department or a licensed physician;
     (5)  Have any medical/dental/surgical/psychiatric treatment without staff's written
          permission, unless there is an emergency.  Upon return to the institution, the inmate
          must notify institution staff if he/she received any prescribed medication or treatment
          in the community for an emergency;
     (6)  Possess any firearm or other dangerous weapon;
     (7)  Get married, sign any legal papers, contracts, loan applications, or conduct any
          business without staff's written permission
     (8)  Associate with persons having a criminal record or with persons who the inmate knows to
          be engaged in illegal activities without staff's written permission;
     (9)  Drive a motor vehicle without staff's written permission, which can only be obtained if
          the inmate has proof of a currently valid drivers license and proof of appropriate
          insurance; or
     (10) Return from furlough with anything the inmate did not take out with him/her (for
          example, clothing, jewelry, or books).

I have read, or had read to me, and I understand the above conditions concerning my furlough and agree to abide
by them.                    See Signature Page, BP-A0291IS
Inmate's Signature:  OSBORN, TERRANCE
                                                       Reg. No.:  23729-009         Date: 07/31/2019
Signature/Printed Name of Staff Witness:  See Signature Page, BP-A0291IS

Record Copy - Inmate Central File;  Copy - Control Center, Chief Correctional Services Supervisor, Correctional
Systems Department, Inmate Use on Furlough

Sequence: 94994

## Conditions of Furlough - Inmate's Copy

1. I will not violate the laws of any jurisdiction (federal, state, or local). I understand that I am subject to prosecution for escape if I fail to return to the institution at the designated time.

2. I will not leave the area of my furlough without permission, with exception of traveling to the furlough destination, and returning to the institution.

3. While on furlough status, I understand that I remain in the custody of the U.S. Attorney General. I agree to conduct myself in a manner not to bring discredit to myself or to the Bureau of Prisons. I understand that I am subject to arrest and/or institution disciplinary action for violating any condition(s) of my furlough.

4. I will not purchase, possess, use, consume, or administer any narcotic drugs, marijuana, intoxicants in any form, nor will I frequent any place where such articles are unlawfully sold, dispensed, used, or given away.

5. I will not use any medication that is not prescribed and given to me by the institution medical department for use or prescribed by a licensed physician while I am on furlough. I will not have any medical/dental/surgical/psychiatric treatment without the written permission of staff, except where an emergency arises and necessitates such treatment. I will notify institution staff of any prescribed medication or treatment received in the community upon my return to the institution.

6. I will not have in my possession any firearm or dangerous weapon.

7. I will not get married, sign any legal papers, contracts, loan applications, or conduct any business without the written permission of staff.

8. I will not associate with persons having a criminal record or with those persons who I know are engaged in illegal occupations.

9. I agree to contact the institution (or United States Probation Officer) in the event of arrest, or any other serious difficulty or illness.

10. I will not drive a motor vehicle without the written permission of staff. I understand that I must have a valid driver's license and sufficient insurance to meet any applicable financial responsibility laws.

11. I will not return from furlough with any article I did not take out with me (for example, clothing, jewelry, or books). I understand that I may be thoroughly searched and given a urinalysis and/or breathalyzer and/or other comparable tests upon my return to the institution. I understand that I will be held accountable for the results of the search and test(s).

12. It has been determined that consumption of poppy seeds may cause a positive drug test which may result in disciplinary action. As a condition of my participation in community programs, I will not consume any poppy seeds or items containing poppy seeds.

13. Special Instructions:

PDF                          Prescribed by PS 5280                    Replaces BP-291 of SEPT 1999

FILE IN SECTION 5 UNLESS APPROPRIATE FOR PRIVACY FOLDER          **SECTION 5**

Sequence: 94994

Spanish:   **Conditions of Furlough**   Template Copy

**This is a translation of an English-language document provided as a courtesy to those not fluent in English. If differences or any misunderstandings occur, the document of record shall be the related English-language document.**

**Esta es una traducción de un documento escrito en inglés, distribuido como una cortesía a las personas que no pueden leer inglés. Si resulta alguna diferencia o algún malentendido con esta traducción, el único documento reconocido será la versión en inglés.**

### Condiciones de Permiso de Salida Temporera - Copia del Reo

1.      No violaré leyes de ninguna jurisdicción (federal, estatal, o local). Entiendo que estoy sujeto al juicio por fuga si no vuelvo a la institución en la fecha designada.

2.      No dejaré el área designada por mi permiso de salida temporera sin autorizaci ón, con excepción al viaje hacia el area designada por el permiso de salida temporera, y el regreso a la institución.

3.      Mientras esté en estado de permiso de salida temporera, entiendo que permanezco en la custodia del General de Fiscal de EE.UU.. Acuerdo a conducirme en una manera que no desacredite a mi persona ni a la Agencia Federal de Prisiones. Entiendo que estoy sujeto a arresto y/o accion disciplinaria de la institución por violación de cualquier condición de mi permiso de salida temporera.

4.      No compraré, poseeré, usaré, consumiré, o administraré ninguna droga narcótica, marihuana, estupefacientes en cualquier forma, ni tampoco frecuentaré cualquier lugar donde tales articulos son ilegalmente vendidos, dispensados, usados, o regalados.

5.      No usaré ninguna medicación que no sea recetada y dada por el departamento médico de la institución para mi uso o recetada por un médico autorizado mientras estoy bajo permiso de salida temporera. No tendré ningún tratamiento médico/dental/quirúrgico/psiquiátrico sin el permiso escrito del personal, excepto en caso de emergencia que requiera tal tratamiento. Notificaré al personal de la institución sobre cualquier medicación recetada o tratamiento recibido en la comunidad al regresar a la institución.

6.      No tendré en mi posesión ninguna arma de fuego o arma peligrosa.

7.      No contraeré matrimonio, ni firmaré cualquier papel legal, contratos, solicitudes de préstamo o conduciré cualquier negocio sin el permiso escrito del personal.

8.      No me asociaré con personas con antecedentes criminales o con aquellas personas quienes conozco estar envueltos en ocupaciones ilegales.

9.      Acuerdo ponerme en contacto con la institución (u Oficial de la Oficina Federal de Libertad Supervisada) en caso de arresto, o cualquier otra dificultad seria o enfermedad.

10.     No conduciré un automóvil sin el permiso escrito del personal. Entiendo que debo tener una licencia de conducir válida y suficiente seguro automovilístico para satisfacer cualquier ley de responsabilidad financiera aplicable.

11.     No volveré de salida temporera con ningún artículo con el cual no haya salido (por ejemplo, ropa), joyas, o libros). Entiendo que puedo ser registrado a fondo y administrado un análisis de orina y/o alcohómetro y/u otras pruebas comparables al regresar a la institución. Entiendo que seré responsable por los resultados del registro y prueba(s).

12.     Ha sido determinado que el consumo de semillas de amapola puede causar un resultado positivo en una prueba de drogas , lo cual puede resultar en acción disciplinaria. Como condición de mi participación en programas comunitarios, no consumiré ninguna semilla de amapola o artículos que contengan semillas de amapola.

13.     Instrucciones Especiales:


Yo he leído, o se me leyeron, y entiendo las condiciones anteriormente dichas acerca de mi permiso de salida temporera y acuerdo a cumplir con ellas.

Firma del Reo:                         Número de Registro:               Fecha:

Firma / Nombre Impreso de Testigo del Personal:


**FILE IN SECTION 5 UNLESS APPROPRIATE FOR PRIVACY FOLDER**          **SECTION 5**

BP-A0291IS      **FURLOUGH APPLICATION - Approval and Record**    Sequence:94994
                               **Inmate Signature Page**

**U.S. DEPARTMENT OF JUSTICE**                      **FEDERAL BUREAU OF PRISONS**

I understand that if approved, I am authorized to be only in the area of the destination shown on the Furlough Application and at ordinary stopovers or points on a direct route to or from that destination.  I understand that my furlough only extends the limits of my confinement and that I remain in the custody of the Attorney General of the United States.  If I fail to remain within the extended limits of this confinement, it shall be deemed as escape from custody of the Attorney General, punishable as provided in Section 751 of Title 18, United States Code.  I understand that I may be thoroughly searched upon my return to the institution and that I will be held responsible for any item of contraband or illicit material that is found.  I have read or had read to me, and I understand that the foregoing conditions govern my furlough, and will abide by them.  I have read or had read to me, and I understand the CONDITIONS OF FURLOUGH.

I understand and agree to abide by all conditions concerning my furlough.


X _Terrance Osborn_
Inmate: OSBORN, TERRANCE
Register No: 23729-009


7/31/19
Date


R. BUIE, UNIT SECRETARY
Witness


7/31/19
Date